# EXHIBIT 9

Dockets.Justia.com

Seyamack Kouretchian (State Bar No. 171741)
Seyamack@CoastLawGroup.com
Ross M. Campbell (State Bar No. 234827)
Rcampbell@CoastLawGroup.com
COAST LAW GROUP, LLP
169 Saxony Road, Suite 204
Encinitas, California 92024
Tel: (760) 942-8505
Fax: (760) 942-8515

Attorneys for Defendants, SHAWN HOGAN
and DIGITAL POINT SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| EBAY, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>DIGITAL POINT SOLUTIONS, INC., SHAWN HOGAN, KESSLER'S FLYING CIRCUS, THUNDERWOOD HOLDINGS, INC., TODD DUNNING, DUNNING ENTERPRISE, INC., BRIAN DUNNING, BRIANDUNNING.COM, and Does 1-20,<br><br>    Defendants. | Case No. CV 08-04052 JF PVT<br><br>**DEFENDANTS DIGITAL POINT SOLUTIONS, INC. AND SHAWN HOGAN'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF [FRCP RULE 12(b)(6)]**<br><br>Date: June 26, 2009<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 |

1

2

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

3

4

5

6

7

PLEASE TAKE NOTICE that on June 26, 2009 at 9:00 AM, or as soon thereafter as the matter can be heard in Courtroom 3 of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, California 95113, defendants DIGITAL POINT SOLUTIONS, INC. and SHAWN HOGAN will move this Court for an order dismissing plaintiff EBAY, INC.'s Second Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

8

Defendants seek the following specific relief:

9

10

11

12

13

Dismissal of each cause of action as to defendants DIGITAL POINT SOLUTIONS, INC. and SHAWN HOGAN on the grounds that the Second Amended Complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), as each cause of action set forth therein is barred by the one-year limitation of actions period set forth in the Commission Junction Publisher Service Agreement.

14

15

16

Defendants hereby request that the Court take judicial notice of its entire case file in this matter, including Plaintiff's initial pleadings, the briefing of the parties on the defendants' initial motions to dismiss, and the Court's February 24, 2009 order thereon.

17

18

19

20

Defendants' motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the accompanying Declaration of Ross M. Campbell and exhibits thereto, the foregoing request for judicial notice, the records and file herein, and upon such other oral and documentary evidence as may be presented at the hearing on this motion.

21

22

23

24

25

26

27

28

---

1

**TABLE OF CONTENTS**

2

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3

I.  SUMMARY OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4

5

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6

III.  LEGAL STANDARD AND SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8

9

    A.  Because the PSA and T&C Supplement Expressly Set Forth the Terms under
which the Affiliate Program will be Administered, the User Agreement is Irrelevant . . . 8

10

    B.  The SAC Must be Dismissed in its Entirety, as Plaintiff's Claims are Barred by the
One-Year Limitations Period Set Forth in the PSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11

12

        1.  The T&C Supplement Expressly Incorporates the Terms of the PSA to the
Extent the Documents do Not Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13

14

        2.  Because the T&C Supplement Does not Prescribe a Differing Limitations
Period, Plaintiff is Bound by the One-Year Provision in the PSA . . . . . . . . . . . 14

15

16

            a.  The PSA and T&C Supplement Must be Construed Together, as Plaintiff
Necessarily Contracted with Reference to the Terms of the PSA . . . . . . . . . 17

17

18

            b.  Because CJ Acted as Plaintiff's Direct Agent, the Close Interrelationship
Between the Parties is Sufficient to Bind Plaintiff under the PSA . . . . . . . . . 18

19

20

            c.  The T&C Supplement's Incorporating Language Indicates that the
One-Year Limitations Period was Intended to Apply . . . . . . . . . . . . . . . . . . . 19

21

            d.  The Language of the One-Year Limitations Period is Directly
Comparable to the Provisions at Issue in the Relevant Case Law . . . . . . . . . 20

22

23

            e.  To the Extent the Contractual Language is Ambiguous, it Must
be Construed against Plaintiff as the Drafter . . . . . . . . . . . . . . . . . . . . . . . . . 20

24

25

        3.  The One-Year Limitations Period is Valid and Enforceable, as Contracting
Parties May Specify Their Own Statutes of Limitation . . . . . . . . . . . . . . . . . . . . 21

26

27

        4.  The SAC is Barred in its Entirety, as the Limitations Provision Applies to
Any Disputes Relating to the Affiliate Marketing Program . . . . . . . . . . . . . . . . 22

28

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases**

*Bell Atl. Corp. v. Twombly* (2007)
    127 S. Ct.1955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Federal Cases**

*Branch v Tunnell* (9th Cir. 1994)
    14 F.3d 449 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Cortec Industries, Inc v Sum Holding L.P. (*2nd Cir. 1991)
    949 F.2d 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Galbraith v. County of Santa Clara* (9th Cir. 2002)
    307 F.3d 1119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Romani v. Shearson Lehman Hutton* (1st Cir. 1991)
    929 F.2d 875 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Seagate Tech. LLC v. Dalian China Express Int'l Corp* (N.D. Cal. 2001)
    169 F.2d 1146 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Soltani v. W. & S. Life Ins. Co.* (9th Cir. 2001)
    258 F.3d 1038 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sprewell v. Golden State Warriors* (9th Cir. 2001)
    266 F.3d 979 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**State Cases**

*Amtower v. Photo Dynamics, Inc.* (2008)
    158 Cal. App. 4th 1582, 1608 - 1610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15

*Beedy v. San Mateo Hotel Company* (1912)
    27 Cal. App. 653, 661-662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Beeson v.* Schloss (1920)
    183 Cal. 618, 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bell v Rio Grande Oil Co.* (1937)
    23 Cal. App. 2d 436, 440 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Boys Club of San Fernando Valley v Fid. & Deposit Co.* (1992)
    6 Cal. App. 4th 1266, 1270, 1271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 20

*Chan v Drexel Burnham Lambert Inc.* (1986)
        178 Cal. App. 3d 632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Coutin v. Nessanbaum* (1971)
        17 Cal. App. 3d 156, 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Crane Co. v. Borwick Trenching Corp., Ltd* (1934)
        138 Cal. App. 319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Enochs v. Christie* (1955)
        137 Cal. App. 2d Supp. 887, 889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fogel v. Farmers Group, Inc.* (2008)
        160 Cal. App. 4th 1403, 1420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995)
        38 Cal. App. 4th 1532, 1548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*King v Larsen Reality, Inc.* (1981)
        121 Cal. App. 3d 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lockheed Martin Corp. v. Continental Ins. Co.* (2005)
        134 Cal. App. 4th 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Neal v. State Farm Ins. Cos.* (1961)
        188 Cal. App. 2d 690, 695 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Peter Kiewit Sons' Co. v. Pasadena City Junior College Dist* (1963)
        59 Cal. 2d 241, 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pacific Employers Ins. Co. v. City or Berkeley* (1984)
        158 Cal. App. 3d 145, 149 - 152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17, 18, 19, 20

*Republic Bank v. Marine Nat. Bank* (1996)
        45 Cal. App. 4th 919, 921, 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 20

*Roberts v. Security T. & S. Bank* (1925)
        196 Cal. 557, 575 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Shaw v. Regents of University of California* (1997)
        54, 58 Cal. App. 4th 44, 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 17, 19

*State of California v. Allstate Ins. Co.* (2009)
        45 Cal.4th 1008, 1036 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Versacci v. Superior Court* (2005)
127 Cal. App. 4th 805, 811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Williams Constr. Co. v. Standard-Pacific Corp.* (1967)
254 Cal. App. 2d 442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wolschlager v. Fidelity National Title Ins. Co.* (2003)
111 Cal. App. 4th 784 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Federal Statutes and Regulations**

Computer Fraud and Abuse Act, 18 U.S.C. §1030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) . . . . . . . . . . . . . . . . . . . . 7

**State Statutes and Regulations**

California Business & Professions Code

§17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

California Civil Code

§1642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

§1644 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Code Civil Procedures

§1859 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

California Penal Code

§502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Treatises & Other Authorities**

Black's Law Dictionary 1452 (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## MEMORANDUM OF POINTS & AUTHORITIES

Defendants Digital Point Solutions, Inc. and Shawn Hogan (collectively, the DPS Defendants)[1] respectfully submit the following Memorandum of Points & Authorities in support of their Motion to Dismiss plaintiff EBAY, INC.'s (Plaintiff's) Second Amended Complaint (SAC):

## I. SUMMARY OF MOTION

The SAC must be dismissed in its entirety because each cause of action set forth therein is barred by the one-year limitation of actions period set forth in the Commission Junction Publisher Service Agreement (PSA).[2]  In that regard, the "eBay Affiliate Program - Supplemental Terms and Conditions" (T&C Supplement) expressly incorporates the provisions of the PSA to the extent the two documents do not conflict.  Indeed, in ruling on Defendants' initial motions to dismiss, the Court already concluded that Plaintiff is bound by the forum selection clause set forth in the PSA.[3]  And as explained below the SAC's references to the User Agreement are entirely insufficient to change that determination.  As such, the only remaining question is whether some basis exists to conclude that the PSA's one-year limitations period does not *also* apply.  As detailed in the following sections, no such basis exists, and because Plaintiff did not file suit within the one-year limitations period, the SAC must be dismissed without leave to amend.  The motion should be granted for the following reasons:

*One*.  Plaintiff's generic User Agreement simply does not apply to the present dispute and the SAC's allegations to the contrary should be disregarded.  In an attempt to plead around the express terms of the PSA and T&C Supplement, the SAC repeatedly alleges that the User Agreement is the controlling document in this case.  In doing so, Plaintiff alleges that the "only authorization given to the Defendants

---

[1] The remaining defendants are collectively referred to herein as the "Non-DPS Defendants," and where applicable, all defendants in this action are collectively referred to as "Defendants."

[2] The DPS Defendants will move, in the alternative, to transfer this action to the United States District Court for the Central District of California pursuant to 28 U.S.C. §1404(a) (via separately filed motion to be heard jointly herewith on the above-referenced date).

[3] Pursuant to the Federal Rules of Evidence, Rule 201, the DPS-Defendants request that the Court take judicial notice of its entire case file in this matter, including Plaintiff's initial pleadings, the briefing of all parties on the Defendants' initial motions to dismiss, and the Court's order thereon, dated February 24, 2009 (hereinafter, the "Order on Motions to Dismiss").

to access eBay's site *in any manner* was by way of eBay's User Agreement." Yet the PSA expressly states that the "Advertiser *is granting to You the right* to display and Link to the Advertiser's Web site . . ." Moreover, there is no question that the direct purpose of the PSA, in conjunction with the T&C Supplement, is to set forth the terms under which Plaintiff's affiliate marketing program will be administered. As such, there is no basis to conclude that the generic User Agreement, which applies to any person visiting eBay's website, should somehow control over those direct provisions.

*Two.* In previously reviewing the operative language of the T&C Supplement, the Court concluded that "[i]ndeed, the T&C Agreement appears expressly to incorporate the terms of the PSA." As detailed below, the T&C Supplement does in fact incorporate the terms of the PSA under California law, as the relevant language expressly refers to the PSA by title and provides that the terms of the PSA shall control to the extent the two documents do not conflict. And although Plaintiff could have specified a differing limitations period in the T&C Supplement, it chose not to do so. As such, Plaintiff is bound by the one-year limitations period under the contract's plain language.

*Three.* Plaintiff is further bound under the PSA because the relevant documents must be taken and construed together. In that regard, Plaintiff necessarily contracted with reference to the underlying terms of the PSA and, by definition, the rights and obligations of the parties to a "supplemental" agreement cannot be fully understood without consideration of the primary writing to which it attaches. Further, Commission Junction administered the affiliate program on Plaintiff's direct behalf and the resulting interrelationship between the parties is sufficient to bind Plaintiff under California law.

*Four.* California courts have repeatedly held that non-signatories to an underlying contract will nonetheless be bound thereby if its terms are properly incorporated by reference. Here, the PSA's one-year limitations provision is directly comparable to contract language held to be binding on non-signatories in similar circumstances. And to the extent the relevant documents are ambiguous, any such ambiguities must be construed against Plaintiff as the drafter.

*Five.* The PSA's one-year limitations period is valid and enforceable, as contracting parties may specify their own statutes of limitation and there is no basis to conclude that the provision is unconscionable; and

*Six.*  The SAC must be dismissed in its entirety, as the PSA prohibits the filing of any <u>lawsuit</u> related to the affiliate marketing program and is not limited to particular claims or causes of action.

## II.  <u>STATEMENT OF FACTS</u>

As the Court is now aware, Plaintiff operates an affiliate marketing program to increase traffic to its on-line trading forum.  (SAC ¶¶18, 19).  Affiliates receive commissions for directing business to Plaintiff's website.  (SAC ¶19).  Plaintiff, and/or its agent, Commission Junction, tracks which affiliates are entitled to commissions through the use of "cookies" - digital tags that store information in the user's browser. (SAC ¶¶19, 21).  At all relevant times, Plaintiff used the services of Commission Junction in administering the affiliate program.  Pursuant to contracts with Plaintiff, Commission Junction was responsible for, among other things, tracking affiliate traffic, monitoring affiliate compliance, preventing fraudulent activity, and paying affiliates using funds remitted by Plaintiff.  (SAC ¶20).

In administering the affiliate program, Commission Junction contracts directly with each affiliate via its "Commission Junction Publisher Service Agreement" (the "PSA") (*See* Decl. of Ross M. Campbell, Ex. 1).[4]  The PSA is a form contract applicable to all affiliate programs administered by Commission Junction; it refers to the entities that operate such programs as "Advertisers" and to the respective affiliates as "Publishers."  (PSA, intro., p. 1).  To participate in Plaintiff's affiliate program, potential affiliates must enter into the PSA as well as Plaintiff's form contract, the "eBay Affiliate Program - Supplemental Terms and Conditions" (the "T&C Supplement"), which sets forth additional terms applicable to Plaintiff's particular program.  (*See* Decl. of Ross M. Campbell, Ex. 2).  The opening paragraph of the T&C Supplement provides:

> In consideration of Your participation in the Affiliate Program (the "Program") maintained by eBay Inc. ("eBay") through Commission Junction, Inc. ("CJ"), You agree to comply with these Supplemental Terms and Conditions ("Terms and Conditions") in addition to the terms of the Commission Junction Publisher Service Agreement ("PSA"). If any of these Terms and Conditions conflict with those of the PSA, then these Terms and Conditions will control.  Capitalized terms not defined herein have the meanings set forth in the PSA.  (*Id.,* Supp. Terms & Conditions, p. 1).

/././

---

[4] As detailed in Section III, below, the Court may consider the PSA and T&C Supplement in adjudicating this motion without converting the same into a motion for summary judgment.

Thus, together, the PSA and T&C Supplement set forth the contractual relationship between Plaintiff and its affiliates, and to the extent the documents do not conflict, the terms of the PSA expressly control. In that regard, the T&C Supplement defers significantly to the PSA with respect to, *inter alia*, the definition of the affiliate program and the relationship between the parties thereunder, the terms and circumstances under which Plaintiff is obligated to compensate affiliates, the definition of "non-bona fide transactions" for which no compensation is due, and the procedural and other miscellaneous provisions typically included in commercial contracts - such as notice, force majeure, choice of law, *forum selection*, and similar clauses. (*See* PSA intro.; §1(d)(ii); §3; §9). In addition, the PSA sets forth a one-year limitation of actions provision, as follows:

> NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST THE OTHER PARTY TO THIS AGREEMENT MORE THAN ONE YEAR AFTER THE TERMINATION OF THIS AGREEMENT. (*Id.* §7(3); capitals in original).

Regarding the present dispute, the SAC alleges that as members of Plaintiff's affiliate program, Defendants engaged in a fraudulent "cookie stuffing" scheme through which Defendants received commissions to which they were not entitled. Specifically, the SAC alleges: (i) Defendants used software programs or code that redirected users to Plaintiff's website without the users realizing it or affirmatively clicking on any referring link, (ii) Plaintiff's website then placed a cookie on the browser of each such user, (iii) any subsequent revenue generating actions were improperly credited to Defendants, and (iv) as a result, Defendants received commissions based on users who had not been referred by Defendants. (SAC ¶¶24-27).

The SAC further alleges the following: Defendants engaged in such conduct until June of 2007 (SAC ¶48), at which time Plaintiff conducted an investigation of defendants' activities, retained a third party firm to assist with the same, verified the details of the purported scheme, and, based thereon, refused to issue payments for the preceding month's traffic. (SAC ¶¶34, 52-56). Also in June of 2007, the Federal Bureau of Investigation conducted a raid and seized Defendants' computers.[5]

/ . / . /

---

[5] *See* Plaintiff's Opposition to DPS Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, p. 1:6-8.

Regarding the relevant procedural history, Plaintiff initially filed suit on August 25, 2008, and filed a First Amended Complaint (FAC) on October 7, 2008. In response, all Defendants moved to dismiss under Rule 12(b)(6) and, based on the forum selection clause set forth in the PSA, the Non-DPS Defendants further moved to dismiss for improper venue under Rule 12(b)(3).[6] In ruling on the venue issue, the Court reviewed the opening paragraph of the T&C Supplement and concluded as follows:

> This language in the T&C Agreement, when read together with eBay's own allegations in the FAC with respect to the role of the PSA, indicates that eBay is a third-party beneficiary of the PSA. Pursuant to the PSA, advertising affiliates earn revenue by "promoting Advertisers," including eBay. *See* PSA at 1. Indeed, the T&C Agreement appears expressly to incorporate the terms of the PSA. [citation]. (Order on Motions to Dismiss, p. 7:6-13; emphasis added).

The Court afforded Plaintiff the opportunity to amend, however, because Plaintiff contended at oral argument that a separate User Agreement supersedes the terms of the PSA. (*Id.*, p. 7:14-15). Although a copy of the User Agreement is not attached to the SAC, Plaintiff continues to assert this position in its amended allegations. In that regard, Plaintiff now alleges that each cause of action set forth in the SAC arises out of violations of the User Agreement, and further contends that the PSA and T&C Supplement do not apply because they did not authorize access to Plaintiff's website in any manner. (SAC ¶¶26, 38).

As was the case with Plaintiff's initial pleadings, the SAC alleges six causes of action as follows: (i) violations of the Computer Fraud and Abuse Act, 18 U.S.C. §1030; (ii) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c); (iii) common law fraud; (iv) violations of California Penal Code §502; (v) unjust enrichment; and (iv) unfair business practices under California Business & Professions Code §17200. Each such claim is based on the alleged "cookie stuffing" scheme referenced above.

### III.  LEGAL STANDARD AND SCOPE OF REVIEW

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*

---

[6] That clause provides, "The exclusive forum for any actions related to this Agreement shall be in the state courts, and, to the extent that federal courts have exclusive jurisdiction, in Los Angeles, California."  (PSA, 9(d)).

(2007) 127 S.Ct. 1955, 1974. In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff. *Sprewell v. Golden State Warriors* (9th Cir. 2001) 266 F.3d 979, 988. However, these principles do not apply to allegations that contradict matters properly subject to judicial notice. *Id.* "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*

Likewise, "when [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading." *Romani v. Shearson Lehman Hutton* (1st Cir. 1991) 929 F.2d 875, 879, fn. 3. In that regard, "a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell* (9th Cir. 1994) 14 F.3d 449, 453 (overruled on other grounds in *Galbraith v. County of Santa Clara* (9th Cir. 2002) 307 F.3d 1119, 1127). The consideration of such documents does not convert the motion to dismiss into a motion for summary judgment. *Id.* at 449; *see also Cortec Industries, Inc. v. Sum Holding L.P.* (2nd Cir. 1991) 949 F.2d 42, 48 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

Here, the SAC expressly refers to both the PSA and T&C Supplement and contends they do not apply because the parties' rights are instead governed by certain User Agreements. (SAC ¶38.) Further, both the PSA and T&C Supplement were at issue with respect to the Non-DPS Defendants' prior motion to dismiss under Rule 12(b)(3), and Plaintiff did not present any evidence challenging their validity. (*See* Order on Motions to Dismiss, p. 6:16-17.) Accordingly, the Court may consider both documents in adjudicating the parties' rights and such consideration will not convert the present motion into a motion for summary judgment.

## IV.  ARGUMENT

### A.   Because the PSA and T&C Supplement Expressly Set Forth the Terms under which the Affiliate Program will be Administered, the User Agreement is Irrelevant.

Throughout the SAC, Plaintiff attempts to allege the applicability of Plaintiff's general "User Agreement" over the more specific terms of the PSA and T&C Supplement. (*See e.g.*, SAC ¶¶26, 33,

38).  For instance, the SAC alleges, "Each of the causes of action set forth herein arises out of [Defendants'] violations of the User Agreement."  (SAC ¶26).  However, Plaintiff has not attached a copy of the User Agreement to the SAC or otherwise set forth the particular terms that are alleged to apply.  As such, the Court need not accept the allegation as true and should disregard it as conclusory.  Further, there is no question that the direct purpose of the PSA, in conjunction with the T&C Supplement, is to set forth the terms under which Plaintiff's affiliate marketing program will be administered.  Indeed, both documents contain express provisions addressing the types of harms alleged in the SAC.  For instance, the T&C Supplement provides:

> You will not deliver any eBay-related cookies or other tracking tags to the computers of users that are merely viewing Your advertisements or while Your applications are merely active or open. [¶] . . .  To qualify as a payable transaction, a user must take an affirmative action, clicking on your properly-coded link in a browser or browser environment.  (T&C Supp., ¶¶3,4; emphasis added).

Similarly, the PSA states:

> You must promote Advertisers such that You do not mislead the Visitor, and such that the Links deliver bona fide Transactions by the Visitor to Advertiser from the Link.  You shall not cause any Transactions to be made that are not in good faith, including, but not limited to, using any device, program, robot, lframes, or hidden frames.  (PSA, §1(d)(ii); emphasis added).[7]

Given the above, Plaintiff's claims that the User Agreement supersedes the terms of the PSA and T&C Supplement are entirely unfounded.  Notably, in ruling on Defendants' initial motions to dismiss, the Court expressly pointed out that "the FAC does not explain how violation of the user agreement is unrelated to the alleged breach of the PSA of why the PSA *should not be considered the primary and controlling agreement for all claims related to the PSA*."  (Order on Motions to Dismiss, p. 7:15-18; emphasis added).  In an apparent attempt to cure this deficiency, Plaintiff contends as follows:

> The User Agreements were the *only basis* on which any Defendant had authorization to access eBay's site.  No agreement entered into by any Defendant in connection with eBay's Affiliate Marketing Program, including but not limited to any Publisher Service Agreement that may have been entered into between CJ and one or more of Defendants and/or any Terms and Conditions of the Affiliate Marketing Program agreed to by one or

---

[7] The fact that the alleged wrongs fit squarely within these contractual provisions reflects the extent to which the federal criminal statutes alleged in the SAC do not apply.

more of Defendants, <u>provides for or *in any way contemplates such access*</u>.  (SAC ¶38; emphasis added).

The SAC further alleges, "The only authorization given to the Defendants to access eBay's site <u>in *any manner*</u> was by way of eBay's User Agreement."  (SAC ¶26).  These contentions are disingenuous at best and should not be well taken, as the PSA expressly states:

> [*T]he Advertiser is granting to You the right to display and Link to the Advertiser's Web site or Web site content* in accordance with the Advertiser's Program Terms for the limited purposes of Promoting the Advertiser's Program, <u>subject to the terms and conditions of this Agreement</u>."  (PSA, §4(a); emphasis added).[8]

As noted above, the PSA and T&C Supplement are in fact directly applicable, and Plaintiff's attempt to avoid the legal consequences of its own form contract should be rejected.  Per the SAC, any person that visits the eBay website automatically becomes a party to the User Agreement as a consequence thereof.  (SAC §26).  Given this incredibly generic application, there is no basis to conclude that the User Agreement should control the discrete "cookie stuffing" allegations set forth in the SAC.  *See* Cal. Code Civ. Proc. §1859 (reciting basic interpretational tenet that "a particular intent will control a general one that is inconsistent with it.").[9]  Indeed, if Plaintiff's contentions were accepted, the PSA and T&C Supplement would never apply.

Based on the foregoing, there can be no question that the User Agreement is inapplicable to this dispute, and the PSA and T&C Supplement expressly control.

**B.     The SAC Must be Dismissed in its Entirety, as Plaintiff's Claims are Barred by the One-Year Limitations Period Set Forth in the PSA.**

As noted above, the PSA contains a one-year limitations period, which provides as follows:

> NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST THE OTHER PARTY TO THIS AGREEMENT MORE THAN ONE YEAR AFTER THE TERMINATION OF THIS AGREEMENT.  (PSA, p. 4; capitals in original).

---

[8] Here, the PSA clearly defines "Program" as the affiliate marketing program, and the phrase "Program Terms" refers to the particular Advertiser's affiliate program terms - in this case, the T&C Supplement. (PSA, intro., §1(b)).

[9] Also of note, the PSA contains an integration clause which has also been incorporated into the T&C Supplement by reference.  (PSA, §9(i)).  Accordingly, any contrary terms in the User Agreement cannot be considered.

Further, the T&C Supplement expressly refers to and incorporates the PSA, including the foregoing provision.  It states:

> In consideration of Your participation in the Affiliate Program (the "Program") maintained by eBay Inc. ("eBay") through Commission Junction, Inc. ("CJ"), You agree to comply with these Supplemental Terms and Conditions ("Terms and Conditions") in addition to the terms of the Commission Junction Publisher Service Agreement ("PSA"). <u>If any of these Terms and Conditions conflict with those of the PSA, then these Terms and Conditions will control.</u>  Capitalized terms not defined herein have the meanings set forth in the PSA.  (T&C Supp., p. 1; emphasis added).

In reviewing this language with respect to Defendants' initial motions to dismiss, the Court accurately concluded that "[i]ndeed, the T&C Agreement appears to expressly incorporate the terms of the PSA."  (Order on Motion to Dismiss, p. 7:9-10).  As detailed below, the T&C Supplement does in fact incorporate the terms of the PSA, including the one-year limitations period set forth above. Moreover, Defendants' membership in the affiliate program terminated in <u>June of 2007</u>, when Plaintiff "verif[ied]" the existence of the purported scheme, ceased authorizing payouts for the alleged unearned commissions (SAC ¶¶34, 52-56), and the FBI seized Defendants' computers.  Because Plaintiff did not commence this action until <u>August 25, 2008</u>, Plaintiff did not file suit within the one-year period and the SAC must therefore be dismissed without leave to amend.

**1.  The T&C Supplement Expressly Incorporates the Terms of the PSA to the Extent the Documents do Not Conflict.**

Under California law, the requirements for incorporation by reference are now well-settled:[10]

> A contract may validly include the provisions of a document not physically a part of the basic contract. . . . "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.]  But each case must turn on its facts. [Citation.]  <u>For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.</u> [citations]. *Shaw v. Regents of University of California.* (1997), 58 Cal. App. 4th 44, 54 (emphasis added); *see also Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal. App. 2d 442, 454.

---

[10] The PSA's choice of law provision states that California law applies.  (PSA, §9(d)).

The contract need not recite that it "incorporates" another document, <u>so long as it "guide[s] the reader to the incorporated document</u>. [citations]." *Shaw, supra,* 54 Cal.App. 4th at p. 54 (emphasis added). By the same token, it is not enough to simply "mention" the external document; there must be specific language "eliciting the parties' consent to its separate terms." *Amtower v. Photo Dynamics, Inc.* (2008) 158 Cal. App. 4th 1582, 1609.

The foregoing principles were at issue in *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal. App. 4th 784, 790. There, in an effort to obtain title insurance, the plaintiff obtained, read and approved a preliminary report issued by the defendant title company. *Id.* at 787. An exhibit thereto contained selected portions of the policy to be issued, but the policy itself was not attached. The exhibit did not reference arbitration and there were no such provisions in the report itself. *Id.* Rather, the report identified the form of title insurance as "C.T.L.A. Coverage Policy 1990," and stated as follows:

> The printed Exceptions and Exclusions from coverage of said Policy or Policies are set forth in Exhibit A attached. Copies of the policy forms should be read. They are available from the office which issued this Report. *Id.* at 791.

The plaintiff subsequently received the full policy, which contained an arbitration provision. When he later filed suit over an undisclosed lien, the title company moved to submit the dispute to arbitration under the policy. *Id.* at 788. On appeal, the court found that the arbitration clause was sufficiently incorporated by reference to bind the plaintiff contractually, as "the Preliminary Report specifically identifies the document incorporated as the Policy, lists the form which is contemplated and tells the recipient where they can find the Policy." *Id.* at 790-791. Because the incorporation was thus clear and unequivocal and the policy was easily available, "[n]othing further was needed to bind the plaintiff." *Id.*

Similarly, in *King v. Larsen Realty, Inc.* (1981) 121 Cal. App. 3d 349, the defendants argued they were not required to arbitrate a dispute over a real estate commission on the ground that they never signed an arbitration agreement. *Id.* at 352. When the defendants initially applied for membership in the local board of realtors, however, they agreed "to abide by the . . . Bylaws and Rules and Regulations of the Paso Robles Board of Realtors [and other organizations.]" *Id.* at 353. The applicable bylaws, in turn, required applicants to arbitrate as set forth in a particular arbitration manual. *Id.* Based on the

foregoing language, the court found that the defendants' agreement incorporated the arbitration clause by reference and rejected their position accordingly.  *Id.* at 357.[11]

By contrast, in *Chan v. Drexel Burnham Lambert Inc.* (1986) 178 Cal. App. 3d 632, the court held that an arbitration provision was not incorporated by reference where the contract did not clearly refer to and identify the incorporated document in which the arbitration clause appeared.  *Id.* at 642.  The contract stated that the signatory would "abide by the Statute(s), Constitution(s), Rules(s) and By-Laws as any of the foregoing are amended from time to time of the agency jurisdiction or organization with or to which I am filing or submitting this application."  *Id.* at 636.  The court found that unlike the clear reference in *King* to "the bylaws of the Paso Robles Board of Realtors," this language "did not identify any document or source by title."  *Id.* at 642-643.  Rather, "[t]he reference was amorphous, and did not guide the reader to the incorporated document."  *Id.* at 643.  Moreover, the court suggested, without so holding, that the plaintiff lacked actual knowledge of the provision allegedly incorporated into the agreement, and left open the question whether the document was "readily available" to the plaintiff.  *Id.* at 644, n.5.[12]

Finally, in *Amtower v. Photo Dynamics, Inc.* (2008) 158 Cal. App. 4th 1582, 1608-1609, the court clarified that the mere identification of an external document by name or title, without more, is insufficient to incorporate its terms.  Rather, the contract must clearly indicate that terms of the external document will apply.  Thus, in that case, a corporate executive was not bound by an attorneys' fees provision set forth in a separate merger agreement because the contract between the parties was complete

---

[11] The foregoing principles are now well-established and have been applied in a variety of factual contexts.  *See e.g. Shaw, supra*, 58 Cal.App. 4th at p. 54 (university bound by 50% royalty provision set forth in patent policy that was clearly referenced in invention assignment agreement with professor); *Bell v. Rio Grande Oil Co.* (1937) 23 Cal.App. 2d 436, 440 (defendant lessee not liable for abandoning oil production efforts because standard lease form, which contained valid surrender clause, was expressly referenced in subject agreement).

[12] Similar outcomes have been reached in other recent cases where the reference to the external document was not clear and unequivocal.  *See e.g. Versacci v. Superior Court* (2005) 127 Cal.App. 4th 805, 811, 817 (reference in employment contract to setting future "goals and objectives" in conjunction with employee evaluation process deemed insufficient to incorporate yet to be determined performance objectives into contract); *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App. 4th 1403, 1420 (insurance policy did not incorporate terms of subscription agreement where referring language failed to identify agreement by title and inaccurately stated its terms).

---

in itself, did not look to the merger agreement for any missing terms, and the references thereto served to separate the two documents rather than incorporate them. *Id.* at 1609.

In the instant case, the T&C Supplement clearly and unequivocally references the "Commission Junction Publisher Service Agreement ('PSA')" by title, and further states, "<u>If any of these Terms and Conditions conflict with those of the PSA, then these Terms and Conditions will control</u>. Capitalized terms not defined herein have the meanings set forth in the PSA." (T&C Supp., p. 1; emphasis added). Thus, unlike the provision at issue in *Chan*, there is no ambiguity or confusion as to which document is intended to apply. And unlike the situation in *Amtower*, the T&C Supplement not only "guides the reader" to the PSA, it looks directly to the PSA to fill in its remaining terms. Further, the terms of the PSA were known and easily available to plaintiff, as plaintiff prepared the T&C Supplement, and Commission Junction was Plaintiff's direct agent at all relevant times. (SAC ¶20).

Particularly relevant here, the Court already concluded that Plaintiff is bound by the forum selection clause set forth in the PSA when it ruled on Defendants' initial motions to dismiss. (Order on Motions to Dismiss, p. 7:19-25). And as detailed above, the SAC's references to the User Agreement are entirely insufficient to change that determination. As such, the only remaining question is whether some basis exists to conclude that the one-year limitations period <u>does not *also* apply</u>. As detailed in the following sections, no such basis exists and the SAC is therefore subject to dismissal.

## 2. Because the Supplemental Terms & Conditions do not Prescribe a Differing Limitations Period, Plaintiff is Bound by the One-Year Provision in the PSA.

The PSA states that no action shall be brought "against the other party to this agreement more than one year after the termination" thereof. (PSA, §7(e); capitals omitted). Per the discussion that follows, this language is binding on Plaintiff under California case law.

In *Pacific Employers Ins. Co. v. City of Berkeley* (1984) 158 Cal.App.3d 145, the court addressed whether a surety was liable under the liquidated damages provision of a construction contract, which had been referenced in the surety's bond. There, a city entered into a contract with a builder to construct a recreation center. *Id.* at 147. The surety issued a performance bond, which identified the contract by name and further stated, "a copy of which is or may be attached hereto, and which is hereby referred to." *Id.* at 148. The contract, in turn, contained the following liquidated damages provision:

> If all the work called for under the contract is not completed before or upon the expiration of the time set forth in the Bidder's Sheet, damage will be sustained by the City. Since it is and will be impracticable to determine the actual damage which the City will sustain in the event of and by reason of such delay, *it is therefore agreed that the Contractor will pay to the City the sum specified in the Bidder's Sheet* [$250 per day] for each and every calendar day beyond the time prescribed to complete the work [May 6, 1976], not as a penalty, but as a predetermined liquidated damage. The Contractor agrees to pay such liquidated damages as are herein provided, and in case the same are not paid, agrees that the City may deduct the amount thereof from any money due or that may become due the Contractor under the contract. *Id.* at 149 (emphasis added).

When the builder subsequently abandoned the project, the surety arranged for another contractor to complete the work but completion of the recreation center was significantly delayed. In the litigation that followed, the city argued the surety was liable under the construction contract at the rate of $250 per day based on the liquidated damages provision set forth above. *Id*. at 148. In addressing this issue, the court first looked to the following interpretational rules applicable to multiple writings:

> Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." This language has been broadened by judicial construction, so that it has been applied to several writings, even though they are not "contracts," for example. "Nor is the statute limited to contracts signed by the same parties and identifying the same subject matter. It applies to 'instruments,' 'papers' and 'contracts,' whether they expressly refer to each other or it appears from extrinsic evidence that they were executed as part of one transaction. [Citations]." *Id.* at 150.

Based on these principles, the court concluded that the bond and construction contract must be construed together, as "the surety necessarily contracts with reference to the contract as made; otherwise it would not know what obligation it was assuming." *Id.* While the court recognized that application of the joint construction rule did not necessarily mean the surety was bound by all covenants in the contract,[13] the court found this principle inapplicable because the surety and contractor stood in comparable contractual positions with respect to their relationship with the city. *Id.* at 151.[14]

---

[13] *See also Amtower, supra,* 158 Cal.App. 4th at p. 1610 (construction of multiple contracts as one does not mean each term "is necessarily applicable to the parties to one of the other agreements.").

[14] On this issue, the court distinguished *Crane Co. v. Borwick Trenching Corp., Ltd.* (1934) 138 Cal.App. 319, where the complaining party (a materials supplier) was a stranger to the bond as well as the underlying contract. *Id.*

Following the Supreme Court's ruling in *Roberts v. Security T. & S. Bank* (1925) 196 Cal. 557, 196 Cal. 575 (*Roberts*) (overruled on another ground in *Peter Kiewit Sons' Co. v. Pasadena City Junior College Dist*. (1963) 59 Cal.2d 241, 245), the court then concluded that because the *builder* was bound by the contract, and the surety incorporated the terms of the contact into the bond, the *surety* was equally bound by the liquidated damages provision. *Id.* at 152.[15]  The court found additional support for its ruling based on "the general rule that contracts should be construed against the party causing any ambiguity in them." *Id.* at 152.

Similarly, in *Boys Club of San Fernando Valley v. Fid. & Deposit Co.* (1992) 6 Cal. App. 4th 1266 (*Boys Club*), the underlying construction contract required the parties to arbitrate "all claims, disputes and other matters in question *between the Contractor and the Owner* arising out of, or relating to, the Contract Documents or the breach thereof," and the performance bond at issue referred to the contract and made it a part by reference. *Id.* at 1270 (emphasis added).  Upon project completion, the plaintiff complained of construction defects and subsequently filed arbitration demands against both the contractor and the surety.  *Id.*  The surety argued that it could not be compelled to arbitrate because it was not a party to the construction contract and never signed an arbitration agreement.  *Id.* at 1270, 1273-1274.  As in *Pacific Employers*, the court rejected the surety's position and found that the surety defined its obligation under the bond when it incorporated the arbitration clause by reference.  *Id.* at 1271, 1273-1274.

*Republic Bank v. Marine Nat. Bank* (1996) 45 Cal. App. 4th 919 is also relevant.  There, a sublease expressly "incorporated [the master lease by] reference" and provided that the sublease was

---

[15] In *Roberts*, the subject bond stated that the work was to be done "in accordance with the plans and specifications 'referred to in said contract, to which contract reference is' had." *Id.* at 563 (emphasis added).  The contract provided that if change orders were agreed to in advance the contractor would receive time extensions in completing the project.  During the course of the work, the owner issued change orders but no extensions were discussed and the project was not completed by the original due date.  *Id.* at 563-564. The Supreme Court concluded the surety was liable for delay damages based on the bond's incorporating language and the circumstances of the transaction.  *Id.* at 566-567. It found that the documents should be read as an indivisible contract and that the surety "must be held to have agreed that it will be equally bound." *Id.* at 567-568.

"subject and subordinate" thereto.[16]  *Id.* at 921.  The master lease provided that the prevailing party would be entitled to its reasonable attorneys' fees in the event of "any action at law or in equity *between Landlord and Tenant . . .*"  *Id.* at 921 (emphasis added).  In subsequent litigation between the subtenant and sublessor, the court ruled that the latter was entitled to attorneys' fees as the prevailing party.  The court concluded that such disputes must be resolved based on the relevant incorporating language and rejected the subtenant's argument that *Pacific Employers* and *Boys Club* were inherently distinguishable because on their differing factual context.  *Id.* at 924.

As detailed below, the foregoing principles are directly applicable to the present dispute.

### a.  The PSA and T&C Supplement Must be Construed Together, as Plaintiff Necessarily Contracted with Reference to the Terms of the PSA.

The instant case, like the circumstances at issue in *Pacific Employers* and *Boys Club*, presents a strong case for construing the relevant contractual documents together.  Again, there is no question that the direct purpose of the PSA is to set forth the terms under which Commission Junction administers affiliate programs on behalf of "Advertisers" such as eBay.  (*See* PSA, p. 1).  Notably, the full title of the T&C Supplement is the "eBay *Affiliate* Program - *Supplemental* Terms & Conditions." (T&C Supp., p. 1; emphasis added).  As such, the document was clearly intended to supplement the PSA, and by definition, the rights and obligations of the parties to a supplemental agreement cannot be fully understood without reference to the primary writing to which it attaches.[17]  Not surprisingly, California courts have therefore held that interrelated contract materials must be taken and construed as one.  *See Beedy v. San Mateo Hotel Company* (1912) 27 Cal.App. 653, 661-662 ("supplementary subscription agreement" must be construed with primary agreement as a "legal unity").

Here, the interrelated nature of the documents is particularly clear, as the PSA *itself* repeatedly references the applicability of the "Advertiser's Program Terms."  (*See e.g.* PSA §1(b) and (c), referring to Advertiser "Program Terms" and "Additional Terms").  Further, as noted above, the T&C Supplement

---

[16] Because the sublease attached the master lease and used express "incorporation" language, it was unnecessary to apply the *Shaw* elements discussed above.  *See id.* at 921, 923.

[17] *See* Black's Law Dictionary 1452 (7th ed. 1999), defining "supplemental" as "[s]upplying something additional; adding what is lacking <supplemental rules>."

---

does not attempt to define the Affiliate Marketing Program or the relationship between the parties in any relevant detail.  Nor does it set forth any provisions detailing the circumstances under which affiliate payments are to be made or, for that matter, any of the typical procedural provisions contained in commercial contracts.  Instead, the T&C Supplement leaves those matters to the PSA.  *See Enochs v. Christie* (1955) 137 Cal. App. 2d Supp. 887, 889 ("a contract may refer to another contract for details or conditions, and when this is the case the contract referred to must be considered as a part of the contract in which reference hereto is made.").

For instance, with respect to affiliate compensation, the PSA states, "The Advertiser compensates the Publisher, *in accordance with this Agreement . . .*" and goes on to set forth the specific circumstances under which "Payouts" will be made and "Chargebacks" will be deducted.  (PSA, p. 1, intro. (emphasis added); §3(a) and (b)).  The chargeback provision, for example, authorizes the debit of funds previously credited to the affiliate's account in cases of, *inter alia*, product returns, Advertiser refunds, and "Non-Bona Fide Transactions" where the individual user is mislead or the affiliate otherwise refers the user in bad faith.  (PSA §1(d)(ii); 3(b)).

Thus, like the circumstance in the surety cases, the contractual documents must be construed together, as plaintiff "necessarily contract[ed] with reference to the [underlying contract]; otherwise it would not know what obligation[s] it was assuming." *Pacific Employers, supra,* 158 Cal.App.3d at 150; *Boys Club, supra,* 6 Cal. App. 4th at 1271.

        **b.**    **Because CJ Acted as Plaintiff's Direct Agent, the Close Interrelationship Between the Parties is Sufficient to bind Plaintiff under the PSA.**

Similar to the situation in *Pacific Employers* and *Boys Club*, Plaintiff and Commission Junction shared a particularly close contractual relationship vis-a-vis the respective affiliates.  In that regard, the SAC states:

> At all relevant times, eBay used the services of CJ, a subsidiary of ValueClick, Inc., in administering the Affiliate Marketing Program.  The relationship between eBay and CJ was governed at all relevant times by various Advertiser Service Agreements.  Under those Agreements, CJ was responsible for, among other things, recruiting affiliates, tracking affiliate traffic, monitoring compliance by affiliates, preventing and detecting fraudulent activity, and paying affiliates using funds remitted by eBay."  (SAC ¶20).

Thus, Commission Junction, as plaintiff's direct agent, carried out duties in administering the affiliate program that Plaintiff would have otherwise been required to perform. Moreover, like the surety in the foregoing cases, Plaintiff ultimately remained responsible for performance of the underlying contract. For instance, the PSA states, "Your recourse for any earned Payouts not paid to You shall be to make a claim against the relevant Advertiser(s), and CJ disclaims any liability for such payment." (PSA, §3(e); emphasis added). Plaintiff's underlying obligation to satisfy affiliate payouts in this manner, is directly comparable to the surety's contractual obligation to guarantee the contractor's performance under the bond. "Under these circumstances, the Supreme Court has held that a reference to the contract must be given broader interpretation," and Plaintiff must be held to be bound by the one-year limitations period accordingly. *See Pacific Employers, supra,* 158 Cal.App. 3d at 151.

### c. The T&C Supplement's Incorporating Language Indicates that the One-Year Limitations Period was Intended to Apply.

In *Republic Bank*, as noted above, the court de-emphasized the formal relationship between the parties and instead focused on the relevant incorporating language. *Republic Bank*, *supra,* 45 Cal.App. 4th at 924. Here, the relevant language in the T&C Supplement clearly indicates that the one-year limitations period was intended to apply. Again, the T&C Supplement expressly provides that the terms of the PSA shall control *to the extent the documents do not conflict.* (T&C Supp., p. 1). Given that language, Plaintiff is presumed to have been aware of, and familiar with, the terms of the PSA. In that regard, the PSA calls specific attention to the one-year limitations period by setting forth the provision in all capital letters. Notably, the provision appears in Section 7, the only part of the PSA that contains such emphasis, and the document expressly states that the provisions in Section 7 are an essential element of the benefit of the bargain. (PSA, §7(h)).

Thus, to the extent Plaintiff intended for a differing limitations period to apply, it would have so specified. The T&C Supplement does not contain a limitation of actions provision nor does it otherwise suggest that the PSA's one-year limitation period does not apply. The fact that Plaintiff did not include such a provision in the T&C Supplement reflects Plaintiff's objective intent that the PSA would control the issue. To the extent Plaintiff contends otherwise, "[t]he true intent of a contracting party is irrelevant

if it remains unexpressed." *See Shaw, supra,* 58 Cal.App. 4th 44, 54. The SAC should be dismissed accordingly.

### d. The Language of the One-Year Limitations Period is Directly Comparable to the Provisions at Issue in the Relevant Case Law.

Particularly relevant, the language of the PSA's limitation period providing that no action shall be brought "against the *other party to this agreement*" is directly analogous to the language at issue in the foregoing cases. *See Boys Club, supra,* 6 Cal. App. 4th at 1270 (non-signatory to original contract bound by provision requiring arbitration of all claims "*between the Contractor and the Owner*"); *Pacific Employers, supra,* 158 Cal.App.3d at 149 (non-signatory to original contract bound by liquidated damages provision stating "that *the Contractor* will pay to the City the sum specified in the Bidder's Sheet"); *Republic Bank, supra,* 45 Cal. App. 4th at 921 (non-signatory to original lease liable under fee provision applicable to "any action at law or in equity *between Landlord and Tenant* . . ."). The Court should therefore find that the PSA's limitation period applies to the present dispute by direct analogy.

### e. To the Extent the Contractual Language is Ambiguous, it Must be Construed against Plaintiff as the Drafter.

It is well settled that "an instrument in writing is construed most strongly against the party who drafted it or caused it to be drafted." *Coutin v. Nessanbaum* (1971) 17 Cal. App. 3d 156, 162. As noted above, the rule applies in the incorporation by reference context. *Pacific Employers, supra,* 158 Cal.App.3d at 152. Further, the rule "applies with particular force in the case of the contract of adhesion." *Neal v. State Farm Ins. Cos.* (1961) 188 Cal. App. 2d 690, 695. Such contracts involve standardized forms, "which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id.* at 694.

Here, to the extent there is any ambiguity as to whether the T&C Supplement incorporated the PSA's one-year limitations period, it must be construed against Plaintiff as the drafter. In that regard, Plaintiff prepared the T&C Supplement as a form document applicable to all affiliates and offered it solely on a take-it-or-leave-it basis. The closing paragraph of the T&C Supplement provides:

> By clicking on the "ACCEPT" link below, You are agreeing to be bound by the terms in these Terms and Conditions. "If You do not understand or agree *to all of the terms and*

*conditions of these Terms and Conditions, click the 'CLOSE' button.*" (Supp. Terms & Conditions, ¶16; emphasis added).

Thus, the only option available to potential affiliates is to accept the document in its entirety or to not participate in the affiliate program at all.  Again, to the extent plaintiff wished to include a differing limitations period in the T&C Supplement it could easily have done so.  As such, any ambiguities must be construed against Plaintiff.

### 3.  The One-Year Limitations Period is Valid and Enforceable, as Contracting Parties May Specify Their Own Statutes of Limitation.

"California courts accord contracting parties substantial freedom to modify the length of the statute of limitations." *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal. App. 4th 1532, 1548.  Thus, it is well-settled that "the parties to a contract may stipulate therein for a period of limitation, shorter than that fixed by the statute of limitations, and that such stipulation violates no principle of public policy, provided the period fixed be not so unreasonable as to show imposition or undue advantage in some way." *Beeson v. Schloss* (1920) 183 Cal. 618, 622 (upholding six-month statute of limitations); *Seagate Tech. LLC v. Dalian China Express Int'l Corp.* (N.D. Cal. 2001) 169 F. Supp. 2d 1146, 1159 (upholding nine-month limitations period).  Thus, to strike down a contractual provision shortening a limitations period, the complaining party must show that the provision is *unconscionable. Soltani v. W. & S. Life Ins. Co.* (9th Cir. 2001) 258 F.3d 1038, 1043.

Here, the one-year limitations period is entirely reasonable as it provides an appropriate means for effectuating closure of disputes related to Plaintiff's affiliate program, and there is no basis to second guess the same (particularly where plaintiff itself adopted the provision).  Further, both the PSA and the T&C Supplement specifically state that no compensation will be due if the user "does not take an affirmative action, clicking on your properly-coded link in a browser or browser environment." (Supp. T&C, ¶4; *see also* PSA, §§1(d)(ii), 3(b)).  As such, the one-year limitations period was adopted by Plaintiff with the types of alleged harms specifically in mind.  The contractual limitations period is therefore valid and enforceable.

/././

/././

4.    **The SAC is Barred in its Entirety, as the Limitations Provision Applies to Any Disputes Relating to the Affiliate Marketing Program.**

As commonly understood, the phrase "no action will lie" means no lawsuit may be filed. *Lockheed Martin Corp. v. Continental Ins. Co.* (2005) 134 Cal. App. 4th 187 (disapproved on other grounds as stated in *State of California v. Allstate Ins. Co.* (2009) 45 Cal. 4th 1008, 1036, fn.11); *see* Civil Code §1644 (providing that the words of a contract "are to be understood in their ordinary and popular sense"). Here, the language in the PSA providing that "[n]o action, suit or proceeding shall be brought . . ." clearly indicates that <u>no lawsuit</u> related to Plaintiff's affiliate marketing program may be filed outside the one-year period. Because there is no question that each cause of action set forth in the SAC is premised on the same purported "cookie stuffing" scheme under the affiliate program, the SAC must be dismissed in its entirety.

## V.  CONCLUSION

For the foregoing reasons, the DPS Defendants respectfully request that the Motion to Dismiss be granted without leave to amend on the grounds that the T&C Supplement incorporates the terms of the PSA by reference, including the one-year limitation of actions provision, and that the SAC therefore fails to state a claim upon which relief can be granted.

DATED: April 27, 2009

                    s/Ross M. Campbell
                    COAST LAW GROUP, LLP
                    169 Saxony Road, Suite 204
                    Encinitas, CA 92024
                    Telephone: (760) 942-8505
                    FAX: (760) 942-8515
                    E-mail: Rcampbell@coastlawgroup.com
                    Attorneys for Defendants, Shawn Hogan
                    and Digital Point Solutions, Inc.