# EXHIBIT 1
## TO THE
## DECLARATION OF JAMES G. GILLILAND, JR. IN SUPPORT OF APPLE INC.'S OPPOSITION TO PSYSTAR CORPORATION'S MOTION TO STRIKE THE DECLARATION OF JACQUES VIDRINE AND FOR SANCTIONS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| APPLE INC., a California corporation, | ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) No. C 08-3251 WHA ) |
| PSYSTAR CORPORATION, a Florida corporation, and DOES 1-10, inclusive, | ) ) ) ) |
| Defendants. | ) San Francisco, California ) Friday ) September 4, 2009 |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**For Plaintiff:**            TOWNSEND AND TOWNSEND AND CREW LLP
Two Embarcadero Center - 8th Floor
San Francisco, California  94111-3834
BY:   **JAMES G. GILLILAND, JR., ESQUIRE**
**MEGAN M. CHUNG, ESQUIRE**
**MEHRNAZ BOROUMAND SMITH, ESQUIRE**

**For Defendant:**            CAMARA & SIBLEY, LLP
2339 University Boulevard
Houston, Texas  77005
BY:   **KIWI ALEJANDRO DANAO CAMARA, ESQUIRE**

**Reported By:**      *Katherine Powell Sullivan, CSR #5812*
*Official Reporter - U.S. District Court*

1                    P R O C E E D I N G S

2      SEPTEMBER 4, 2009                        10:05 A.M

3

4            THE CLERK:  Calling civil 08-3251, Apple versus

5      Psystar.

6            Counsel, please state your appearance for the record.

7            Would you like everyone to come to the microphone,

8      Your Honor?

9            THE COURT:  Yes.

10           THE CLERK:  Counsel, please come to the microphone.

11           MR. GILLILAND:  Good morning, Your Honor.

12           Jim Gilliland and Mehrnaz Smith and Megan Chung for

13     the plaintiff Apple.

14           THE COURT:  Good morning.

15           MR. CAMARA:  Good morning, Your Honor.

16           Kiwi Camara for the defendant Psystar Corporation.

17           THE COURT:  Everyone have a seat.

18           I read most of this material.  Have you resolved all

19     of your problems?  First, let me ask this --

20           MR. CAMARA:  Half of them, Your Honor.

21           THE COURT:  What half have you resolved?

22           MR. CAMARA:  We have resolved parts two and three of

23     the briefing.

24           We have resolved the dispute about Mr. Schiller's

25     testimony concerning whether he had compared Apple products to

1  Psystar products.

2          And we've resolved the issue about the missing

3  affidavit and about whether or not that was relied on in one of

4  the expert reports.

5          So the outstanding issues are the testimony of

6  Jacques Vidrine and the document production.

7          **MS. CHUNG:**  It is my understanding, Your Honor, that

8  Psystar is withdrawing their motions on sections two and three.

9          **MR. CAMARA:**  We are, Your Honor.

10          **THE COURT:**  Well, all right.

11          Now, I need to -- reading your material here, I want

12  to -- something dawned on me.  I am conducting a wedding in

13  October.  The wedding is one of my former law clerks.  Not

14  Ms. Chung.  She is already married.  It's a different law clerk

15  from about five years ago.  And she is marrying Tom --

16          **MR. CAMARA:**  LaPerle.

17          **THE COURT:**  -- LaPerle.

18          So in October I will be standing in front of Thomas

19  LaPerle, who I see here is now a witness.

20          **MR. CAMARA:**  Congratulations, Your Honor.

21          We have no problem.

22          **THE COURT:**  All right.  So that you waive any

23  conflict?

24          **MR. CAMARA:**  We waive any conflict arising out of

25  your presiding.

1      THE COURT:  How about Apple?

2      MS. CHUNG:  We have no issues, Your Honor.

3      THE COURT:  What?

4      MS. CHUNG:  We waive any conflict.  We have no

5  issues.

6      THE COURT:  Fine.  That's not an issue then.

7      Okay.  So tell me, what is the first issue?

8      MR. CAMARA:  Your Honor, the first issue is the

9  testimony of Jacques Vidrine.  Mr. Vidrine is the head of OS X

10  security.  He was not disclosed either in Apple's initial

11  disclosures or in any supplementation to any of those

12  disclosures.

13      THE COURT:  Wait a minute.  Disclosures only require

14  them to disclose who they are going to rely on.

15      MR. CAMARA:  This is true.

16      He wasn't disclosed in response to any -- in any

17  form, in response to any question about who had conducted

18  investigation into whether Psystar circumvented Apple's

19  technological protection measures.

20      He was not disclosed in response to any --

21      THE COURT:  Wait.  You are using the word

22  "disclosure," and that bothers me.  You've got to use the right

23  terminology here.

24      Rule 26(a) says, "The name and, if known, address and

25  telephone number of each individual likely to have discoverable

1   information that the disclosing party may use to support its

2   claims or defenses."  "May use to support its claims or

3   defenses."  It does not have to disclose witnesses that are

4   going to help you.

5          Now, if you had propounded an interrogatory and said,

6   "Name each person who has done X, Y, or Z," and Mr. Vidrine fit

7   within that, they would have to tell you that in the answer.

8          But your motion -- I read it.  Your motion is

9   directed at a disclosure violation.  You say, "Apple failed to

10  disclose by agreeing in its initial disclosures or in any

11  supplement to those disclosures."

12         Well, if that's true, then the answer is they can't

13  rely on Vidrine, period, for any purpose.

14         **MR. CAMARA:**  Okay, Your Honor.

15         **THE COURT:**  Are you planning on relying on Vidrine as

16  a witness on summary judgment and/or at trial, Ms. Chung?

17         If you are, you are out of luck unless you get relief

18  from your default.

19         **MS. CHUNG:**  Your Honor, we have the issue of the

20  notice of pendency in other action in Florida case.  And my

21  response to that will depend on that issue.

22         Because our position was that we had an outstanding

23  discovery response to Psystar.  And we specifically asked them

24  if they -- and we asked them with meet and confer with the

25  prior counsel for Psystar about R&D development, as well as any

1　new products that are coming into the case.

2　　　　　THE COURT:　Wait a minute.　On the present

3　pleadings --

4　　　　　MS. CHUNG:　Yes.

5　　　　　THE COURT:　Forget that case in Florida for a moment.

6　　　　　MS. CHUNG:　Okay.

7　　　　　THE COURT:　If you didn't disclose Vidrine, you are

8　not going to be allowed to use him.　That's just the way it is.

9　　　　　Now, a substantial justification for using him would

10　be if at the last minute some new issue came out of left field,

11　and they brought it up on the other side such that you were

12　surprised, and now you've got to enlarge the group of witnesses

13　you want to rely on.

14　　　　　I would allow you, for that kind of substantial

15　justification, to submit a new supplement to your initial

16　disclosures, even at this late hour, if it really was that

17　scenario.

18　　　　　But I'm not going to do it because there's some

19　lawsuit in Florida.　That has nothing to do with my lawsuit.

20　　　　　MS. CHUNG:　I understand, Your Honor.

21　　　　　THE COURT:　So the normal answer to this problem is

22　they didn't have to disclose Vidrine.　But the penalty for not

23　doing it is they can't use him.

24　　　　　MS. CHUNG:　We understand.

25　　　　　THE COURT:　So that's -- that's --

1        **MS. CHUNG:** We do believe there was new issues raised

2 by counsel. But if you give me one moment, I will --

3        **THE COURT:** All right.

4        (Pause)

5        **MS. CHUNG:** Your Honor, Apple will not use

6 Mr. Vidrine either for trial or for purposes of summary

7 judgment.

8        **THE COURT:** Any of your experts who are going to be

9 relying on him?

10        **MS. CHUNG:** No.

11        **THE COURT:** That's an indirect way.

12        So Vidrine is out of your case totally?

13        **MS. CHUNG:** Yes.

14        **THE COURT:** That ends the Rule 26 problem.

15        **MR. CAMARA:** It does, Your Honor.

16        **THE COURT:** All right. So now how about the document

17 request problem?

18        **MR. CAMARA:** Your Honor, the documents have been

19 produced by Apple as a continuous sequence of digitized files.

20        **THE COURT:** I read that. But they said that your

21 predecessors agreed to that. And you have been even worse,

22 they say.

23        **MR. CAMARA:** There is no evidence of the agreement

24 either that Apple has produced in writing. There is no e-mail

25 that manifests that agreement. There is no signed document of

1  any kind that manifests that agreement.

2          We have conferred with prior counsel twice today,

3  once before the meet and confer with Apple, and once after.

4  Before the meet and confer, we asked if there was any agreement

5  that the documents be produced other than in the ordinary

6  manner in which they are kept.  Former counsel said there was

7  no such agreement.

8          At the meet and confer, Apple told us they reached an

9  oral agreement with prior counsel that the documents would be

10  produced, clumped by source or custodian of the document, but

11  with no further information about what the source was or the

12  internal organization of the documents from that source.

13          We took that information and again asked former

14  counsel whether there was any such agreement.  And I have

15  e-mail from five minutes ago, from former counsel, saying that

16  there was no such agreement.

17          And so the manner in which the documents are

18  produced, it's a continuous stream, which gives us no

19  information about how each of the individuals -- and Apple

20  stores documents by individuals rather than centrally --

21  organized those documents, nothing at all, other than the page

22  by page electronic files themselves.

23          **THE COURT:**  Ms. Chung.

24          **MS. CHUNG:**  Your Honor, we attended that meet and

25  confer with opposing counsel.  So did Mr. Gilliland,

1  Ms. Boroumand Smith.

2        And we did have that agreement that we will not be

3  providing source information, including metadata which contains

4  the folder structure or file path information that Mr. Camara

5  seeks now at this late hour.

6        **THE COURT:**  Wait a minute.  When were these documents

7  produced?

8        **MS. CHUNG:**  These documents have been produced by

9  Psystar since December of 2008, without any of the folder

10  structure, and since January of 2009, from Apple.

11        **THE COURT:**  If this violated something, why didn't

12  someone raise it before now?

13        **MS. CHUNG:**  That is exactly our point, Your Honor.

14  We never raised it because we knew that this agreement existed.

15        And Psystar has raised other issues with myself

16  directly to meet and confer about document production, but

17  never raised this issue.

18        **THE COURT:**  If this was a violation of something, why

19  didn't your prior counsel say something about it?

20        **MR. CAMARA:**  I don't know that, Your Honor.  I'm not

21  aware of what caused many of the decisions that were made by

22  prior counsel.

23        I will say that when we came into the case, we have

24  supplemented all of our productions, with possibly one

25  exception, so that they are organized by document requests.

1   So Psystar is now picking one of the two alternatives

2   under the rule.  To the extent Apple has a complaint -- and

3   they haven't raised one yet, but to the extent they do, we will

4   correct the rest of our production to be responsive by document

5   request.

6   The delay may be evidence or not evidence of an

7   agreement, but we think we are entitled to get the documents

8   produced correctly, or to get an appropriate sanction for our

9   time in organizing those documents if there is in fact --

10  **THE COURT:**  Both sides did it.  Sounds like both

11  sides did it this way, so there was an agreement.

12  Isn't that evidence of an agreement, that it was

13  unobjected to for all this time?  It's a course of conduct

14  unobjected to.  That tends to show there was an agreement to do

15  it this way.

16  **MR. CAMARA:**  It does, Your Honor.  But there are

17  agreements in writing about a whole variety of other far less

18  important things than this.

19  For example, e-mail service is documented in writing.

20  The fact that things will appear in TIF files appears in

21  writing.

22  We have consulted prior counsel, and they've denied

23  that there is any such agreement.

24  We have no evidence of such an agreement.  Apple has

25  produced no evidence of such an agreement.

1    And the burden on us of this deviation from the rules

2 and the local order and your supplemental order is massive

3 because of the volume of documents that Apple has produced and

4 the complete lack of structure to those documents.

5    Now, we have offered a variety of concessions.  We

6 agreed not to seek the source information that's required by

7 the supplemental order, who the custodian was and how they

8 searched for the documents.

9    We requested in our briefing that they reproduce all

10 the documents sorted by document request.  That would be very

11 burdensome.  We would be willing to accept the folder structure

12 that shows us how these documents were kept in each individual

13 custodian's hands.

14    So we are doing our best to make this as minimally

15 burdensome for Apple as possible.  But a giant array of

16 documents, one electronic file with a Bates label as its file

17 number per page is --

18    **THE COURT:**  How hard would it be for you to give an

19 affidavit, Ms. Chung, that would say Bates numbers A through B

20 came from so and so's file; C through D came from somebody

21 else's file?  How hard would it be for you to do that?

22    **MS. CHUNG:**  Your Honor, we produced thousands of

23 pages and collected from many, many custodians.  So at this

24 time, I cannot tell you how long that would take for us to

25 actually go back and correspond and correlate to this

1   information that you're seeking -- or Mr. Camara is seeking.

2          And I would like to correct one representation made

3   by Mr. Camara. He said he's not seeking a concession, the

4   source information. But that is not true.

5          He is absolutely seeking the source information

6   because he is seeking the file path and the folder structure

7   for every electronic document Apple has produced.

8          That is a tremendous amount of burden on Apple at

9   this time, when we are in the midst of expert discovery and

10   preparing for summary judgment stages, for us to do this at

11   this time.

12       **MR. CAMARA:** Your Honor, this is going to impose a

13   massive burden on one party or the other. There is no question

14   about that.

15          Either we do our best to reconstruct this and sort it

16   out by going through the documents manually, as we've done in

17   part and haven't finished, or Apple does it.

18          The question, I would think, is it's much easier for

19   Apple to do this than it is for us to do that.

20       **MS. CHUNG:** But, Your Honor, my point is that it was

21   Psystar's burden, if they had any objections, to raise it

22   during fact discovery with prior counsel, or even when

23   Mr. Camara joined as the representing counsel for Psystar.

24          And for them to ask now, even after fact discovery

25   deadline, is burdensome. And it's actually besides -- it's

1 | beyond the time when they should have asked this information.

2 | And he had the opportunity and the chance at every

3 | deposition he took to ask questions about the documents, the

4 | organization of the documents.  And Mr. Camara and his

5 | colleagues did not choose to do so.

6 | So Apple should not be burdened, at this time, to do

7 | the work for Psystar that they failed to do and they chose not

8 | to do.

9 | **MR. CAMARA:**  We raised this issue on the tenth day

10 | after the fact discovery, which is the deadline in Your

11 | Honor's --

12 | **THE COURT:**  I know, but that's literally the last day

13 | it could be raised.  I went back to check.

14 | **MR. CAMARA:**  I agree, Your Honor.

15 | **THE COURT:**  This is the kind of thing that

16 | responsible counsel would have raised on the first time they

17 | got documents that didn't comply, so that going forward it

18 | could be fixed.

19 | And, instead, now you're trying to go back to

20 | re-litigate issues that were raised for the first time -- which

21 | should have been raised a long time ago.

22 | **MR. CAMARA:**  Your Honor, we certainly would have

23 | preferred that these had been raised earlier.

24 | When we came in the case we made a strategic decision

25 | about what was most important.  We decided preparing for those

1   depositions and taking those depositions -- which consumed many

2   of the business days in August, and for which a large part of

3   my team actually moved out to California -- was the priority at

4   that point.  We don't think, though, that that strategic

5   decision excuses Apple's failure to comply with the rules.

6          We're not asking for a special concession because we

7   came into the case late.  We're merely asking for the

8   information that the federal rules entitle us to.  And we're

9   not even asking for all --

10         **THE COURT:**  They did entitle you to that way back

11  then.  But I don't think -- you just can't --

12         Ms. Chung, are you prepared to swear under oath, now,

13  as to this prior agreement?

14         **MS. CHUNG:**  Yes, Your Honor.

15         **THE COURT:**  Please take the witness stand.

16         The clerk will swear in Ms. Chung.

17         **THE CLERK:**  Please raise your right hand.

18         (The oath was administered to Ms. Chung.)

19         **MS. CHUNG:**  Yes.

20         **THE CLERK:**  Please, be seated.

21         **THE COURT:**  Ms. Chung, what's your name?  What is

22  your name?  Speak clearly into the microphone.

23         **MS. CHUNG:**  Megan Chung.

24         **THE COURT:**  Is that microphone on?  I don't hear her.

25         **THE CLERK:**  I thought it was.

1          MS. CHUNG:  It's not on.

2          (Pause.)

3          MS. CHUNG:  Megan Chung.

4          THE COURT:  Thank you.

5          What is your connection to this case?

6          MS. CHUNG:  I am counsel of record on behalf of

7     plaintiff and counter-defendant Apple Inc.

8          THE COURT:  Describe briefly what the issue is that

9     you were telling us about before you went under oath.

10         MS. CHUNG:  Psystar filed a motion in which it had

11    stated that Apple -- or it had requested that Apple provide

12    folder structure information and source information for all

13    documents that Apple had produced.

14         But Apple had an agreement, it's my belief, and I

15    participated on the call with Psystar's lead trial counsel,

16    Mr. Robert Yorio and Colby Springer, about an agreement that

17    the parties do not provide source information, including

18    metadata, in September of 2008, with follow-up communications

19    in the fall of 2008.

20         THE COURT:  All right.  You're saying in

21    September 2008, you personally were in a conversation with

22    opposing counsel; is that correct?

23         MS. CHUNG:  Yes.

24         THE COURT:  And was this in person or on the

25    telephone?

1        **MS. CHUNG:**  We talked on the telephone to start our

2  26(f) conference.

3        **THE COURT:**  And who else was present?

4        **MS. CHUNG:**  Mr. Gilliland, James Gilliland, and

5  Mehrnaz Boroumand Smith, of Townsend, Townsend and Crew,

6  representing Apple Inc., participated on the conference call

7  with Mr. Robert Yorio and Mr. Colby Springer representing

8  Psystar Corporation.

9        **THE COURT:**  All right.  Specifically, what was said

10  by each side?  Don't use conclusory language.  What was said by

11  each side on this subject?

12        **MS. CHUNG:**  At the time of the 26(f) conference in

13  September, we discussed specifically our document production

14  and Your Honor's supplemental standing order.

15        Ms. Boroumand Smith raised the issue of the

16  requirements in Judge Alsup's supplemental standing order with

17  respect to the privilege log and document production, and that

18  it would be burdensome for the parties to have to provide such

19  information at the time of the production and of the service of

20  the privilege log.  Mr. -- I can't recall specifically if it

21  was Mr. Yorio or Mr. Springer who agreed.

22        And then it was followed up with specifically

23  conversation about metadata that -- and I believe that issue

24  was raised by, again, Ms. Boroumand Smith, and that we would be

25  also excluding the source information in the form of metadata,

1 with the possible -- no.  So that we would be excluding the

2 source information of the metadata.  And Mr. Springer agreed to

3 that.

4       And then Mr. Gilliland said with the exception of

5 possibility the Web site content, because Psystar may be

6 changing their Web site content and we may need to be able to

7 see the information with respect to the metadata on that

8 Web site content.  To which Mr. Springer responded that they

9 would need to talk to Psystar about Web site information.

10       Following that conversation, I had a conversation

11 with Mr. Springer about Web site information.  And then another

12 conversation, I believe, Ms. Boroumand Smith had with

13 Mr. Springer, where the issue of version control came up for

14 the source code, Psystar source code and the Web site

15 information.  And we discovered that Psystar did not maintain

16 version control for the source code or for the Web site, so the

17 metadata issue with respect to the Web site became moot.

18       **THE COURT:**  All right.  Any questions, Mr. Camara?

19       **MR. CAMARA:**  You mentioned that you reached an

20 agreement with Mr. Yorio and Mr. Springer about what is

21 required to be produced under Judge Alsup's standing

22 supplemental order in civil cases; is that right?

23       **MS. CHUNG:**  Yes.

24       **MR. CAMARA:**  Did you further discuss the scope of

25 Apple's obligations under the federal rules, setting aside the

1 special supplemental order?

2        **MS. CHUNG:** We discussed further that we would not be

3 providing/producing electronic documents in its native format.

4 That, instead, we would be -- the parties -- now, I don't

5 remember if we raised it or if Mr. Yorio raised the issue, but

6 that the counsel on the conference call in September agreed

7 that we would be producing the documents not in its native

8 format but, rather, in PDF and TIF electronic -- searchable

9 electronic format.

10        After that conversation, Psystar counsel -- I can't

11 remember if it was Mr. Springer or now Mr. Grewe who raised the

12 issue of producing a hard copy.

13        **MR. CAMARA:** And, in fact, that agreement was reduced

14 to writing about not producing in native format, right?

15        **MS. CHUNG:** Actually, I cannot recall that. I

16 don't -- I don't remember seeing that.

17        **MR. CAMARA:** Okay. So you mentioned one part of the

18 federal rules you discussed, which is whether you would produce

19 in native format.

20        Did you discuss in any other way Apple's obligations

21 under the federal rules, setting aside, again, the supplemental

22 order?

23        **MS. CHUNG:** We never discussed about Apple's

24 obligations.

25        **MR. CAMARA:** Your Honor, that's our point. Our point

1    is that even setting aside --

2           THE COURT:  Have you finished your examination?

3           MR. CAMARA:  Why did you not reduce the agreement you

4    entered into about the supplemental order to writing?

5           MS. CHUNG:  I'm sorry?

6           MR. CAMARA:  You testified that you didn't reduce the

7    agreement you reached with Mr. Springer and Mr. Yorio in

8    September of 2008, to writing.

9           You didn't reduce it to writing; is that right?

10          MS. CHUNG:  I thought either myself or Ms. Boroumand

11   Smith had reduced it to writing to opposing counsel.  But when

12   we searched, since you filed your motion, we could not find it.

13          MR. CAMARA:  And is it customary at Townsend to

14   reduce agreements with opposing counsel to writing?

15          MS. CHUNG:  Normally, when we have good relationship

16   with opposing counsel, it is not my practice to reduce it in

17   writing.

18          MR. CAMARA:  So an agreement like this, about the

19   form of all of Apple's discovery, you would not have sent a

20   confirming e-mail to opposing counsel?  That is not Townsend's

21   practice?

22          MS. CHUNG:  I can't speak for Townsend practice

23   because we don't necessarily have a policy on that.

24          MR. CAMARA:  And it's not your practice to send a

25   confirming --

1    **MS. CHUNG:** My practice is not -- I -- my practice

2  is, generally, to reduce in writing only if I feel it will

3  become an issue and when all the issues have been met and

4  conferred with opposing counsel and decided.

5    **MR. CAMARA:** If you had reduced other issues to

6  writing in this case -- for example, if I told you there were

7  writings that evidence your agreement about not providing

8  native format files, would you then be surprised that you

9  didn't reduce this other agreement to writing?

10   **MS. CHUNG:** No.

11   **MR. CAMARA:** You said you only reduce things to

12  writing when you have an adversarial relationship with opposing

13  counsel; is that right?

14   **MS. CHUNG:** I do not reduce to writing if I have a

15  good relationship with opposing counsel.

16   **MR. CAMARA:** Do you have a good relationship with

17  Carr & Ferrell?

18   **MS. CHUNG:** At the time of the 26 conference and in

19  2008, yes, we were able to reach many agreements.

20   **MR. CAMARA:** Would it surprise you, then, that you

21  reduced to writing all kinds of agreements with Carr & Ferrell,

22  including agreements about e-mail service, about the production

23  of documents in native format, and about a host of other

24  topics?

25   **MS. CHUNG:** I don't believe I reduced to writing

1  those topics.

2          **MR. CAMARA:**  Are you aware of whether or not other

3  members of the Townsend, Townsend and Crew team present here

4  habitually reduced agreements to writing?

5          **MS. CHUNG:**  Well, I don't know about "habitually,"

6  but I do know that they have reduced to writing some agreements

7  with Carr & Ferrell.

8          **MR. CAMARA:**  Have you seen Ms. Smith reducing

9  agreements to writing?

10          **MS. CHUNG:**  I have seen her reduce -- put in writing

11  the agreements with Carr & Ferrell, especially this year, in

12  2009.

13          **THE COURT:**  How much more do you have?

14          **MR. CAMARA:**  That's it, Your Honor.

15          **THE COURT:**  All right.  Thank you.

16          Ms. Chung, you can step down.

17          Here's the answer.  I don't know whether there was an

18  agreement or not.  It's too hard to tell.  I think Ms. Chung is

19  acting in good faith in thinking there was an agreement, but

20  maybe the other side didn't know.

21          Here's the main point.  This whole -- I'm not going

22  to rule on that.  This should have been raised a long time ago,

23  if it was a problem.  Now you're raising it way after the fact,

24  and it's too late to reorganize things.

25          I'm sympathetic to your issue, so here's what we're

1  going to do.  Write this down.  Each side, by Tuesday at noon,

2  can send a letter to the other side and identify up to 50

3  pages, and say, "Tell me where these 50 pages came from."  And

4  then the other side has got to respond by Friday of next week,

5  say, "Here's the file that it came from."

6          For example, you would want to say Mr. Vidrine's desk

7  file hard copy.  That would be adequate.  Or Vidrine's computer

8  e-mails.

9          So each of you can pick out the 50 you're most

10 interested in knowing about, and serve it on the other side.

11 And you'll learn where the sources were for those 50.

12         But beyond that, we are not going to go back and redo

13 it for all the other documents in the case, most of which don't

14 matter anyway.  And so you pick out the 50 that you care about.

15 50 individual pages.

16         Now, if it happens to be a 30-page document, you can

17 pick out the first page.  And then the other 30, presumably,

18 came from the same source.  So you can do that.

19         But you can't then object on the ground, oh, they've

20 used up 30 pages because it was a 30-page document.  No.

21 That's one page.  In a way, this is like 50 different documents

22 or 50 different pages.

23         You need Bates number.  Each of you used unique Bates

24 numbers, right?

25         **MR. CAMARA:**  Yes, Your Honor.

1          **MS. CHUNG:**  Yes.

2          **THE COURT:**  Give them a list of the 50 Bates numbers

3    you are interested in.  And the other side has got to respond.

4    Say the name of the person.  Was it a hard copy?  Was it a desk

5    file?  What was the name of the file, if it was a desk file?

6          For example, if the name of the desk file said, "Ways

7    to suppress competition," then you would say, "Vidrine's file

8    on ways to suppress competition."

9          **MS. CHUNG:**  Yes, Your Honor.

10         **MR. CAMARA:**  Your Honor, might we also ask for a

11   small award of fees for the bringing of this motion?

12         **THE COURT:**  No.

13         **MR. CAMARA:**  Thank you, Your Honor.

14         **THE COURT:**  Because you are lucky to get this.  And

15   both sides are going to get it.  You are going to have to

16   respond, too.

17         This motion should have been brought a long time ago.

18   The fact that it wasn't does tend to indicate there was an

19   agreement.  Then new counsel came in and decided to go a

20   different way.

21         So I'm not ruling that there was or was not an

22   agreement.  I'm just saying for the sake of making this an

23   easier case for both of you to try and get organized, it would

24   be useful for you to have that information.

25         Okay.  So what else do I need to decide today?

1    **MR. CAMARA:** I believe the plaintiffs have requested

2 a status conference about the Florida matter. We have no other

3 discovery disputes.

4    **THE COURT:** All right. What's the deal on -- what do

5 you want, Ms. Chung, on the Florida matter?

6    **MS. CHUNG:** Actually, Mr. Gilliland will be speaking

7 on that matter.

8    **THE COURT:** All right.

9    **MS. CHUNG:** Thank you, Your Honor.

10    **MR. GILLILAND:** Good morning, Your Honor.

11    **THE COURT:** Good morning.

12    **MR. GILLILAND:** First, I want to thank you for

13 carving the time out of your schedule to meet with us today.

14    The reason that Apple asked for this status

15 conference is because of the filing last week of a complaint in

16 the Southern District of Florida, in which Psystar basically

17 mimics the allegations and claims that are pending here and

18 which will be resolved, we believe, at trial in January. So in

19 the interest of efficiency and not asking the courts to do

20 duplicative labor, we wanted to talk with Your Honor about how

21 to now proceed.

22    Basically, the case filed in Florida, which we have

23 submitted to the Court, asked for declaratory relief that

24 Psystar does not infringe Apple's copyrights by loading its

25 Apple software onto Psystar computers; that Psystar does not

1  violate the Digital Millennium Copyright Act by circumventing a

2  technological protection measure.  And those issues, as the

3  Court well knows, are precisely the ones set forth in this

4  lawsuit.

5          Psystar, also in Florida, reasserts the antitrust

6  causes of action that this Court already considered and

7  dismissed in November of 2008.

8          So the question presented, of course, is:  Why did

9  they do that?  What's the basis for arguing that there should

10 be a separate lawsuit in Florida?

11         And Psystar's justification, which we think is

12 groundless, is that the Florida action involves Version 10.6 of

13 Apple's operating system, called a Snow Leopard.  And as

14 represented to the Court in Florida, this lawsuit in California

15 only involves Version 10.5, which is called "Leopard."

16         **THE COURT:**  Is called what?

17         **MR. GILLILAND:**  Leopard.

18         **THE COURT:**  Leper --

19         **MR. GILLILAND:**  L-e-o-p-a-r-d.

20         **THE COURT:**  Leopard.

21         **MR. GILLILAND:**  Leopard.

22         **THE COURT:**  The other one was Snow Leopard, but this

23 is Leopard?

24         **MR. GILLILAND:**  That's correct.  One has spots and

25 the other is white or something.

1          **MR. CAMARA:**   They both have spots.

2          **MR. GILLILAND:**   But the representation, Your Honor,

3    that this lawsuit only involves Leopard, or Version 10.5, is

4    wrong.   That's not what our allegations say.   And those are not

5    the only issues that will be resolved by this Court.

6          If you will indulge me for a moment, I will show you

7    references to our complaint.

8          **THE COURT:**   All right.

9          **MR. GILLILAND:**   These are quotes from the amended

10   complaint.

11         Paragraph 15 says that in October, 2008, Psystar

12   announced it was going to sell new products with a new

13   unauthorized version of Mac OS X operating system.   That's not

14   limited to Version 10.5 or Version 10.6.   It's Mac OS X.

15         In Paragraph 24 we allege that Apple never authorized

16   Psystar to install any of Mac OS, Mac operating system.   Again,

17   not limited to Version 10.

18         With respect to the copyright infringement actions,

19   we do specifically reference this is Leopard, but we also

20   allege that they have infringed our copyright in Mac OS X and

21   the Mac operating system.

22         And in the Digital Millennium Copyright Act

23   allegations, paragraph 46, we allege that Psystar admits that

24   Mac OS X, again without limitation on the version, normally

25   will not run on non-Apple-labeled computers.   But Psystar has

1  come up with technology to allow it to run on Psystar

2  computers.

3          In certain respects, Your Honor, it's as though there

4  were an infringement action pending in this court in which a

5  publisher, such as the Rudder Group, alleged infringement of

6  the copyright on the treatise *Federal Civil Procedure Before*

7  *Trial* by Judges Schwarzer and Taschima, and then 3,000 miles

8  away the infringer filed an action saying, "We want declaratory

9  relief that we do not infringe the copyright on the 2009

10 update."

11         Version 10.6, Snow Leopard, is written on top of

12 Version 10.5.  You can't run Snow Leopard without having

13 Leopard.  And the copyrights to Mac OS X cover the subsequent

14 versions, as well.

15         **THE COURT:**  I understand the background.  But this is

16 not a motion.  This is just a status conference.

17         **MR. GILLILAND:**  Yes.

18         **THE COURT:**  So what is your point?  Why did you want

19 a status conference?

20         **MR. GILLILAND:**  First of all, to alert the Court to

21 this issue.  And, secondly, to request a couple of

22 possibilities.

23         One is that we reopen discovery for 30 days, so that

24 Apple can get the source code for, apparently, Psystar's new

25 product, and we take a step back.

1    This relates to what Ms. Chung said earlier.  On

2  Friday of last week, seven days ago, Psystar announced that it

3  was selling a computer that runs with Snow Leopard.  We have

4  not seen the source code for that technology, but we believe

5  that it is subsumed within the allegations in our complaint.

6    Consequently, we suggest as follows:  That the

7  parties -- that the Court allow discovery for another 30 days;

8  that Psystar turn over the source code for its new product;

9  that we be allowed to ask Mr. Pedraza what he did; and Apple

10  will make Mr. Vidrine available to testify about any changes in

11  the technological protection measure, so that those issues can

12  be finally resolved at the trial in January.

13    Beyond that, we will, of course, make a motion either

14  in this court to stay the proceedings in Florida, or in the

15  Florida court to transfer them here, or both.

16    But in the short run, in order to make this as

17  efficient as possible, our request is that the Court allow us

18  to take the small amount of discovery specifically related to

19  the newest product, released seven days ago.  And, in exchange,

20  we will offer to make Mr. Vidrine available for anything that

21  relates to the changes as between Leopard and Snow Leopard.

22    **THE COURT:**  Mr. Camara, what do you say?

23    **MR. CAMARA:**  Your Honor, the difference between the

24  Florida case and this case is that Florida relates to Snow

25  Leopard, this to Leopard.  And that changes the evidence that

1 is at issue in both cases.

2      The technological protection mechanism that Apple

3 uses in Snow Leopard is different from the mechanism that it

4 uses in Leopard, which means the evidence for the circumvention

5 claims, the DMCA claims and the copyright infringement claims

6 will be different in Florida than here.

7      And the technique that Psystar uses to cause Snow

8 Leopard to run on non-Apple hardware is completely different in

9 Snow Leopard than in Leopard.  So, again, the evidence is

10 completely different.

11      And if we look at the manner in which the parties --

12 or more specifically Apple has conducted discovery so far, we

13 see that they have carved out at every occasion Snow Leopard

14 from this case.

15      And here I'm going to describe deposition testimony.

16 I don't know if you want to somehow move to close this to the

17 world, but I'm going to talk about AEO testimony, if you want

18 to do anything.

19      **MS. CHUNG:**  Yes.

20      **MS. SMITH:**  Yes.

21      **MR. GILLILAND:**  Apparently, Your Honor, we are going

22 to talk about the specifics of the technological protection

23 measure; and, therefore, we would request the courtroom be

24 disclosed.

25      **THE COURT:**  These people in the audience here, are

```
 1   they members of the public, or what?
 2            UNIDENTIFIED SPEAKER:  Public San Francisco resident.
 3   Non-reporter.
 4            THE COURT:  Well, I don't like to close the
 5   courtroom.
 6            Give me a general statement.  Why would you be
 7   getting into this?
 8            MR. CAMARA:  I just want to quote portions of
 9   deposition transcripts which are designated "Attorneys' Eyes
10   Only."  Not for any technical details, but merely to show that
11   Apple has continually objected to all testimony about Snow
12   Leopard.
13            THE COURT:  Well, is that part true, that Apple
14   objected to testimony on Snow Leopard?
15            MR. GILLILAND:  No, Your Honor.
16            In fact, I have deposition testimony about Snow
17   Leopard that I can hand you.
18            MR. CAMARA:  And I can quote deposition objections
19   from Ms. Smith, if you would like.
20            THE COURT:  Well, I can't resolve this part today, no
21   matter what you quote.
22            So, all right.  I understand.  I'm not ruling against
23   you or for you on this point, Mr. Camara.  I want to understand
24   your full argument.
25            MR. CAMARA:  Sure.  So this case, we think the
```

1  discovery has been fully completed with respect to Leopard,

2  with respect to whether Psystar's business practices throughout

3  its inception until the time it switched from Leopard to Snow

4  Leopard are legal or not.  That discovery as been conducted.

5  Fact discovery is closed.  We are now in expert discovery.  And

6  we have a schedule that will work for both sides to

7  expeditiously resolve the legality of Psystar's business up

8  until Snow Leopard, by trial in January.

9       We don't want to upset that by going into all new

10  fact discovery about the manner in which Psystar circumvents or

11  does not circumvent Snow Leopard, and about the nature of the

12  technological protection measures that Apple uses in Snow

13  Leopard.

14       If Apple had wanted to raise those claims, it could

15  have done so by expressly supplementing to include Snow Leopard

16  when it came out.  It could have done so, again, by --

17       **THE COURT:**  Help me understand.  When did Snow

18  Leopard 10.6 come out?

19       **MR. CAMARA:**  I believe it was August 28th, which

20  is --

21       **THE COURT:**  Of this year?

22       **MR. CAMARA:**  Of this year.

23       **THE COURT:**  August 28th.

24       **MR. CAMARA:**  Which is after the close of fact

25  discovery in this case.

1     **THE COURT:** And when did your company make this

2  announcement about your product?

3     **MR. CAMARA:** It was last week. I don't remember

4  precisely which day last week.

5     **THE COURT:** And just tell me, what did your

6  announcement say?

7     **MR. CAMARA:** We announced we are offering for sale

8  computers running Snow Leopard.

9     **THE COURT:** Okay.

10     **MR. CAMARA:** So we would propose to have those issues

11  be litigated in the Florida court.

12     The Florida court, of course, will be free to give

13  any preclusive effect that is appropriate to the decision of

14  this court in January.

15     So to the extent the issues are the same -- we think

16  they are not the same, but to the extent they are the same,

17  Mr. Gilliland will be able to make preclusion motions in the

18  federal court in Florida.

19     Meanwhile, we will get an expeditious ruling from the

20  jury, and from this Court on summary judgment, about the legal

21  issues involved in Psystar's business from its inception until

22  a week ago, which is what discovery has been about in this case

23  to this point.

24     **THE COURT:** Mr. Gilliland, what do you now say in

25  response?

1       **MR. GILLILAND:** That nothing could possibly be more
2  inefficient than what Mr. Camara has just proposed.

3       This Court has studied these issues deeply. We have
4  a trial coming up in January. It involves all the
5  technological protection measures in Leopard.

6       And if there are any modest changes in Snow Leopard,
7  let's just find out what they are right now, and include them
8  in the trial in January.

9       Why in the world would we start all over again with a
10 whole new court 3,000 miles away, when this court and the
11 parties are primed and ready to go?

12      **MR. CAMARA:** Your Honor, the change -- the new
13 discovery that would have to be taken is not trivial.

14      For example, Mr. Vidrine, who the Court has already
15 ordered will not be able to testify, is the person who is
16 charged with designing the new technological protection
17 measures for Snow Leopard.

18      If Apple thought Snow Leopard was covered by this
19 case, they should have disclosed Mr. Vidrine. He is the guy
20 who designed the protection measures. We would have to take
21 his deposition.

22      **THE COURT:** Well, I understand that. Possibly -- I'm
23 not saying it would be, but possibly this new development which
24 just occurred would constitute, quote, substantial
25 justification for a revised disclosure, even at this late date,

1  and to add Mr. Vidrine.  And then he would be made available

2  and so forth.

3          Look, here is the answer to this.  The answer is:

4  You've got to bring a motion.

5          Right now I'm not going to open discovery.  We have a

6  trial.  But if you want to bring a formal motion to -- there's

7  no way we could have a trial in January if we do what you want

8  to do, because you then are thinking, "Oh, that judge has

9  nothing to do but work on my case."

10         That's not true.  I've got 400 cases.  And you would

11 then be taking a month of my time away to work on summary

12 judgment, and so forth, and expect me to get this case ready

13 for trial by January.

14         If you want to give up your trial date in January and

15 say, "Okay, let's litigate the issue of Snow Leopard and 10.6

16 and the new product by the defendant," the Court would consider

17 that.

18         I can see relevance, of course, to the -- I'd also be

19 concerned, if it is true -- I don't know that it's true that

20 there's been stonewalling by Apple on the issue of Snow

21 Leopard, so that it would be unfair to allow you to enlarge the

22 pleadings.  I'm not saying it has been stonewalling, but that's

23 what you want to show me.

24         And so you can make that submission.  And then the

25 Court would have to decide whether to enlarge the discovery

1  period and redo the trial schedule.

2         So I'm not ruling yes or no.  This is too

3  complicated, too many nuances for me to give you an answer off

4  the top of my head.  I think this has got to be briefed.

5         In the meantime, if the Court in Florida is going to

6  have to make a ruling on whether to go forward with that case

7  or transfer it, or whatever -- and I will say for the record

8  I'm happy for that case to be transferred here.  I'm not

9  resisting that.  I'm not inviting it, either.  I'm just saying

10  it would be a plausible thing for the judge there to say the

11  case ought to be transferred here.

12         Or maybe it will be an MDL, In Re Snow Leopard.  In

13  Re Snow Leopard litigation.  I can just see that now.  Maybe it

14  will go to Florida because then I won't have to do any more

15  work on this case.

16         Look, that's the best I can do for you.  You're going

17  to have to bring a formal motion.  But, in the meantime, the

18  case schedule stands.

19         **MR. GILLILAND:**  Do you mind if we bring that motion

20  on less than 35 days notice, Your Honor?

21         **THE COURT:**  I think you should.  So your opening

22  motion, when can you do it?

23         **MR. GILLILAND:**  One week from today, Your Honor --

24  yes, we can do it Friday of next week.

25         **THE COURT:**  All right.  That's going to be the 11th.

1  Then I will give one week for the reply, on the 18th.  Then

2  any -- I'm sorry, for the opposition, is what I meant to say.

3  The reply will be the 21st.

4          That means that you will be working over the weekend.

5          **MR. GILLILAND:**  That won't be the first time we've

6  done that in this case.  Right, Mr. Camara?

7          **MR. CAMARA:**  Not surprised.

8          **THE COURT:**  I am surprised to hear that.

9          All right.  9/24 will be the argument, at 8:00 a.m.

10          **MR. GILLILAND:**  Thank you very much, Your Honor.

11          **THE COURT:**  That's about 20 days, instead of 35.

12          **MR. GILLILAND:**  Appreciate that.

13          **MR. CAMARA:**  Thank you, Your Honor.

14          There is one more outstanding issue, which is that

15  motion with supplemental briefing that was done last week,

16  about compelling testimony on damages, I don't know if the

17  Court --

18          **THE COURT:**  That's still pending.  What about it?

19          **MR. CAMARA:**  I don't know if the Court wanted to take

20  any further argument on that.

21          **THE COURT:**  I don't want any more argument.  I

22  understand that issue.  I think we now have everything we're

23  supposed to have on that.  Don't we?

24          **MR. GILLILAND:**  Yes, Your Honor.

25          **MR. CAMARA:**  Yes, Your Honor.

1        **THE COURT:**  Okay.  I think we are at the end.

2        **MR. CAMARA:**  Thank you, Your Honor.

3        **MR. GILLILAND:**  Thank you for your time.

4        **THE COURT:**  You are most welcome.

5        (At 10:52 a.m. the proceedings were adjourned.)

6        --oOo--

7

8

9

10        **CERTIFICATE OF REPORTER**

11        I certify that the foregoing is a correct transcript

12 from the record of proceedings in the above-entitled matter.

13

14 DATE:  Friday, September 4, 2009

15

16        s/b Katherine Powell Sullivan

        ————————————————————————————

17        Katherine Powell Sullivan, CSR #5812, RPR, CRR

18                U.S. Court Reporter

19

20

21

22

23

24

25