# EXHIBIT 12

Dockets.Justia.com

1 | **ERNSTER LAW OFFICES, P.C.**
John H. Ernster, Esq., State Bar No. 59338
2 | Phil J. Montoya, Jr., Esq., State Bar No. 124085
70 South Lake Avenue, Suite 750
3 | Pasadena, California 91101
Telephone: (626) 844-8800
4 | Facsimile: (626) 844-8944

5

6 | **Scott Patrick Barlow, Esq., State Bar No. 182295**
General Counsel
7 | 4353 Park Terrace Drive
Westlake Village, California 91361
8 | Telephone: (818) 575-4500
Facsimile: (818) 575-4505

9

10 | Attorneys for Plaintiff
Commission Junction, Inc.

11

12

13 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

14 | FOR THE COUNTY OF ORANGE, CENTRAL BRANCH

15

16 | COMMISSION JUNCTION, INC., ) CASE NO.: 30-2008 00101025
) ASSIGNED FOR ALL PURPOSES TO:
17 | Plaintiff, ) JUDGE RANDELL L. WILKINSON
) DEPARTMENT C25
18 | v. )
)
19 | THUNDERWOOD HOLDINGS, INC. dba ) **SECOND AMENDED COMPLAINT**
KESSLER'S FLYING CIRCUS; TODD ) **FOR DAMAGES**
20 | DUNNING; BRIAN DUNNING; and ) 1. Breach of Contract
DOES 1 through 50, inclusive, ) 2. Open Book Account
21 | ) 3. Account Stated
Defendants. ) 4. Reasonable Value
22 | ) 5. Conversion
) 6. Unfair Competition
23 | ) 7. Declaratory Relief
)
24 | _____ ) *[Unlimited]*

25

26 | Plaintiff Commission Junction, Inc. alleges as follows:

27 | 1. At all times relevant herein, plaintiff Commission Junction, Inc. ("CJI") was

28 | a corporation organized and existing under the laws of the State of Delaware and wholly

1

1  owned by ValueClick, Inc., a corporation organized and existing under the laws of the

2  State of California with its principal place of business in the County Los Angeles, State of

3  California.

4      2.    CJI is informed and believes that at all times relevant herein defendant

5  Kessler's Flying Circus was a California general partnership doing business in the State of

6  California and the Counties of Los Angeles and Orange.

7      3.    CJI is informed and believes that at all times relevant herein defendant

8  Thunderwood Holdings, Inc. was a California corporation doing business at times as

9  "Kessler's Flying Circus", in the State of California and the Counties of Los Angeles and

10  Orange. Thunderwood Holdings, Inc. was at all times relevant a general partner of

11  Kessler's Flying Circus.

12      4.    CJI is informed and believes that at all times relevant herein defendant Todd

13  Dunning is an individual doing business in the State of California and the Counties of

14  Los Angeles and Orange. Todd Dunning was at all times relevant a general partner of

15  Kessler's Flying Circus.

16      5.    CJI is informed and believes that at all times relevant herein defendant Brian

17  Dunning is an individual doing business in the State of California and the Counties of

18  Los Angeles and Orange. Defendants Kessler's Flying Circus, Thunderwood Holdings,

19  Inc., Todd Dunning, and Brian Dunning will be referred to hereinafter collectively as

20  "KESSLER".

21      6.    At all times herein mentioned CJI's headquarters and principal place of

22  business was in Westlake Village, California. The indebtedness described herein was

23  incurred and payable within the County of Los Angeles, State of California and in the

24  above judicial district.

25      7.    Said obligation is commercial in nature and not based on a retail installment,

26  sales contract, or a conditional sales contract and is not to subject the provisions of

27  California Civil Code §1812.10 and/or §2984.4.

28    ///

8.     CJI is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues said defendants by such fictitious names. CJI will amend this Complaint to allege the true names and capacities of said defendants when they are ascertained. CJI is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner to pay the obligation described herein and that CJI's losses as alleged herein were proximately caused by said defendants' conduct.

9.     CJI is informed and believes and thereupon alleges that there exists an identity of interest between Thunderwood Holdings, Inc. (on the one hand) and Todd Dunning, Brian Dunning, and DOES 1-5 (on the other hand); that Todd Dunning, Brian Dunning, and DOES 1-5 completely and entirely dominate the affairs of Thunderwood Holdings, Inc., that Thunderwood Holdings, Inc. was and is undercapitalized and acts as a mere shell and alter ego for Todd Dunning, Brian Dunning, and DOES 1-5, and that to recognize the existence of Thunderwood Holdings, Inc. as separate from Todd Dunning, Brian Dunning, and DOES 1-5 would be a fiction and would result in a fraud and an injustice.

10.     CJI is informed and believes and thereupon alleges that each of the defendants herein are principals, agents, and employees of the other(s), acting at all time herein mentioned within the course and scope of their agency and employment and with the consent and permission of the other co-defendants.

## FIRST CAUSE OF ACTION

### (Breach of Contract against KESSLER and DOES 1-20)

11.     CJI incorporates by this reference above paragraphs 1 through 10, inclusive, as if fully set forth herein.

12.     On or about April 14, 2005, CJI and defendants KESSLER, DOES 1-20, and each of them, entered into a written Publisher Service Agreement ("Agreement") whereby CJI agreed to provide goods and services to and for KESSLER. A true and correct copy of

1  the parties' Agreement is attached hereto as Exhibit "A" and incorporated herein by this

2  reference. While Exhibit "A" is the Agreement defendants KESSLER, DOES 1-20, and

3  each of them, entered into the with CJI, it does not show the parties' signatures inasmuch

4  as defendants KESSLER, DOES 1-20, and each of them, chose to enter into the Agreement

5  via the Internet and the defendants have a copy of the Agreement printed that day.

6      13.   The Agreement includes the following provisions:

7      [KESSLER] "may not place Links to an Advertiser's Web Site or Web Site

8      content in third party newsgroups, message boards, blogs, unsolicited email

9      and other types of spam, link farms, counters, chatrooms, or guestbooks."

10     Agreement at Section 1(d)(i);

11     [KESSLER] "shall not cause any Transactions to be made that are not in

12     good faith, including, but not limited to, using any device, program, robot,

13     Iframes, or hidden frames." Agreement at Section 1(d)(ii);

14     "None of Your [KESSLER's] promotional activities may infringe an

15     Advertiser's proprietary rights  CJ's [CJI's] proprietary rights, or a third

16     party's proprietary rights. Agreement at Section 1(d)(iii);

17     "You [KESSLER] represent and warrant that all promotional means used by

18     You [KESSLER] will not contain objectionable content (including but not

19     limited to content that is misleading, libelous, defamatory, obscene, violent,

20     bigoted, hate-oriented, illegal, and/or promoting illegal goods, services or

21     activities), and that You [KESSLER] will not mislead others. You

22     [KESSLER] agree to: (i) use ethical and legal business practices, (ii) comply

23     with the Advertisers' Program terms and this Agreement, (iii) maintain a

24     privacy policy on Your Web site and for any non-Web site based promotional

25     method made available to Visitors, and (iv) designate Your [KESSLER]

26     Publisher Account as "special" if You [KESSLER] promote an Advertiser(s)

27     by any means other than displaying a Link to the Advertiser on Your

28     [KESSLER] Web site. CJ [CJI] must approve all of Your [KESSLER]

1      promotional activities and may deem Your [KESSLER] promotional

2      activities inappropriate and a material breach of this Agreement in CJ's

3      [CJI's] sole discretion."  Agreement at Section 2(b); and

4      "You [KESSLER] represent and warrant that: (i) You [KESSLER] have all

5      appropriate authority to operate, and to any and all content on, Your

6      [KESSLER] Web site(s); (ii) You [KESSLER] have all appropriate authority

7      in any promotional method you may choose to use."  Agreement at

8      Section 7(c)(ii).

9      14.    CJI has performed all conditions, covenants, and promises required on its

10     part to be performed in accordance with the terms and conditions of said Agreement.

11     15.    CJI is informed and believes, and on that basis alleges, that beginning in

12     April of 2007 and continuing thereafter, defendants KESSLER, DOES 1-20, and each of

13     them, breached the Agreement by, *inter alia*, the following:  KESSLER was providing

14     third parties with the ability to place widgets on Websites that KESSLER did not

15     own/operate without permission from the website owners to do so; KESSLER's

16     WhoLinked provided a widget used by bloggers and webmasters to display a list of

17     high-ranking sites linking to their site; KESSLER's MySpaceMaps provided widgets users

18     placed on social networking profiles, including MySpace; and KESSLER did not comply

19     with the blog sites' terms and, importantly, the following MySpace terms, which prohibit

20     commercial activity without consent:

21             "Non-commercial Use by Members.  The MySpace Services are for the

22             personal use of Members only and may not be used in connection with any

23             commercial endeavors except those that are specifically endorsed or

24             approved by MySpace.com. Illegal and/or unauthorized use of the MySpace

25             Services, including collecting usernames and/or email addresses of Members

26             by electronic or other means for the purpose of sending unsolicited email or

27             unauthorized framing of or linking to the MySpace Website is prohibited.

28             Commercial advertisements, affiliate links, and other forms of solicitation

5

1        may be removed from Member profiles without notice and may result in

2        termination of Membership privileges. Appropriate legal action will be taken

3        for any illegal or unauthorized use of the MySpace Services."

4        "Content/Activity Prohibited. The following is a partial list of the kind of

5        Content that is illegal or prohibited to post on or through the MySpace

6        Services. MySpace.com reserves the right to investigate and take appropriate

7        legal action against anyone who, in MySpace.com's sole discretion, violates

8        this provision, including without limitation, removing the offending

9        communication from the MySpace Services and terminating the Membership

10       of such violators. Prohibited Content includes, but is not limited to Content

11       that, in the sole discretion of MySpace.com: ... involves commercial

12       activities and/or sales without our prior written consent such as contests,

13       sweepstakes, barter, advertising, or pyramid schemes."

14       16.     CJI is informed and believes, and on that basis alleges, that beginning in

15   April of 2007 and continuing thereafter, defendants KESSLER, DOES 1-20, and each of

16   them, further breached the Agreement by, *inter alia*, inflating traffic, forcing cookies,

17   infringing on other's proprietary rights, providing links and widgets to wrongfully promote

18   and/or force traffic to ebay.com, and promoting objectionable content as that is defined in

19   the Agreement. In addition, such actions by KESSLER, DOES 1-20, and each of them,

20   were fraudulent, unfair, deceptive, and misleading advertising and business practices which

21   are also breaches of the Agreement.

22       17.     Among other damaging results, these actions by defendants KESSLER,

23   DOES 1-20, and each of them, resulted in alleged violations of CJI's agreements with

24   eBay, Inc. which further resulted in the amount of $565,517.84 not being paid by eBay,

25   Inc. to CJI despite CJI paying that amount to defendants KESSLER, DOES 1-20, and each

26   of them.

27       18.     Pursuant to Section 3 of the Agreement, CJI has a right to a return from

28   defendants KESSLER, DOES 1-20, and each of them of the wrongful payment made to

1     defendants KESSLER, DOES 1-20, and each of them.

2         19.    Since June of 2007, CJI has requested that defendants KESSLER,

3     DOES 1-20, and each of them, perform their obligation, under the Agreement, by returning

4     the inadvertent payment of $565,517.84 made to defendants KESSLER, DOES 1-20, and

5     each of them, which payment was not due to defendants based on their conduct as set forth

6     herein above. True and correct copies of certain, but not all, requests for return of the

7     $565,517.84 are attached hereto collectively as Exhibit "B" and incorporated herein by this

8     reference.

9         20.    Defendants KESSLER, DOES 1-20, and each of them, further breached the

10     Agreement by failing and refusing to pay the sum owed as set forth herein above.

11         21.    In addition, defendants KESSLER, DOES 1-20, and each of them, breached

12     the implied covenant of good faith and fair dealing by, *inter alia*, the conduct set forth

13     herein above, failing and refusing to pay the sum owed, and failing to respond to repeated

14     requests for payment.

15         22.    No part of that sum has been paid, and is now due, owing and unpaid from

16     defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007, and

17     interest thereon.

18         23.    As a further result of the breach by defendants KESSLER, DOES 1-20, and

19     each of them, CJI has retained counsel and has incurred, and will incur, attorneys' fees and

20     expenses in an amount according to proof, which it is entitled to recover pursuant to the

21     Agreement.

22

23                     <u>SECOND CAUSE OF ACTION</u>

24               (For Open Book Account Against All Defendants)

25         24.    CJI incorporates by reference the allegations of paragraphs 1 through 23

26     above as though fully set forth herein.

27         25.    CJI is informed and believes, and thereon alleges, that within the last year,

28     defendants KESSLER, DOES 1-20, and each of them, became indebted to CJI on an open

1   book account for a balance due in the sum of $565,517.84 as of June 15, 2007 for goods

2   and services furnished and delivered to defendants, and each of them, at their request.

3       26.   No part of this sum has been paid, although demand therefor has been made,

4   and the sum of $565,517.84 is now due and owing from said defendants, and each of them,

5   to CJI.

6

7                           THIRD CAUSE OF ACTION

8                       (For Account Stated Against All Defendants)

9       27.   CJI incorporates by reference the allegations of paragraphs 1 through 26

10  above as though fully set forth herein.

11      28.   CJI is informed and believes, and on that basis alleges, that beginning in June

12  of 2007 and continuing thereafter, there was an account stated between CJI and defendants,

13  and each of them, in which the sum of $565,517.84 was agreed on as the balance due CJI.

14      29.   No part of such sum has been paid, although demand therefor has been made,

15  and the sum of $565,517.84 is now due and owing from said defendants, and each of them,

16  to CJI.

17

18                         FOURTH CAUSE OF ACTION

19                    (For Reasonable Value Against All Defendants)

20      30.   CJI incorporates by reference the allegations of paragraphs 1 through 29

21  above as though fully set forth herein.

22      31.   CJI is informed and believes, and on that basis alleges, that beginning in

23  June 2007 and continuing thereafter defendants, and each of them, became indebted to CJI

24  in the reasonable sum of $565,517.84 for goods and services furnished to defendants, and

25  each of them, at their request, and that defendants promised to pay the reasonable value for

26  goods and services furnished.

27      32.   No part of such sum has been paid, although demand therefor has been made,

28  and the sum of $565,517.84 is now due and owing from said defendants, and each of them,

1  to CJI.

2

3  <center>FIFTH CAUSE OF ACTION</center>

4  <center>(Conversion against All Defendants)</center>

5  33.  CJI incorporates by this reference above paragraphs 1 through 32, inclusive,

6  as if fully set forth herein.

7  34.  At all times relevant, CJI had a right of ownership of its $565,517.84.

8  However, based on the wrongful conduct by and activities of defendants KESSLER, DOES

9  1-50, and each of them, as more fully described in Paragraphs 12-18 herein above, that sum

10  was wrongfully delivered to defendants KESSLER, DOES 1-50, and each of them.

11  35.  In June of 2007, CJI sent a payment of $565,517.84 to defendants

12  KESSLER, DOES 1-50, and each of them. As set forth herein above, defendants

13  KESSLER, DOES 1-50, and each of them, were not owed the described sum of

14  $565,517.84 or at all.

15  36.  On numerous occasions, CJI has requested the return of the $565,517.84

16  from defendants KESSLER, DOES 1-50, and each of them, however, said defendants have

17  refused to return CJI's property and have converted it as their own. The actions of

18  defendants KESSLER, DOES 1-50, and each of them, wrongfully and intentionally

19  interfered with CJI's right of possession of the $565,517.84.

20  37.  Because defendants KESSLER, DOES 1-50, and each of them, have

21  wrongfully exercised possession of CJI's property, there is now due, owing and unpaid

22  from defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007,

23  and interest thereon.

24

25  <center>SIXTH CAUSE OF ACTION</center>

26  <center>(Unfair Competition against All Defendants)</center>

27  38.  CJI incorporates by this reference above paragraphs 1 through 37, inclusive,

28  as if fully set forth herein.

<center>9</center>

<center>SECOND AMENDED COMPLAINT FOR DAMAGES</center>

39.  As more fully described in Paragraphs 12-18 herein above, defendants KESSLER, DOES 1-20, and each of them, engaged in unfair, deceptive, and misleading advertising and business practices. Such conduct by defendants KESSLER, DOES 1-20, and each of them, violates California Business and Professions Code §17200 *et al*.

40.  Indeed, the actions of defendants KESSLER, DOES 1-20, and each of them, were unfair, deceptive, and misleading advertising and business practices such that the United States Federal Bureau of Investigation and/or United States Attorney initiated a Grand Jury investigation into said practices and subpoenaed CJI's business records regarding defendants KESSLER, DOES 1-20, and each of them.

41.  Since July of 2007, CJI has requested that defendants KESSLER, DOES 1-20, and each of them, halt its wrongful actions and return CJI's inadvertent payment of $565,517.84 made to defendants KESSLER, DOES 1-20, and each of them, which payment was not due to defendants based on their conduct as set forth herein above.

42.  Defendants KESSLER, DOES 1-20, and each of them, failed to halt their wrongful conduct as herein above alleged and have failed and refused to pay the outstanding sum of $565,517.84.

43.  No part of that sum has been paid, and is now due, owing and unpaid from defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007, and interest thereon.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief against All Defendants)

44.  CJI incorporates by this reference above paragraphs 1 through 43, inclusive, as if fully set forth herein.

45.  An actual controversy has arisen and now exists between CJI and defendants KESSLER and DOES 1-50, inclusive. CJI contends that defendants KESSLER and DOES 1-50, inclusive, engaged in unfair, deceptive, and misleading advertising and business practices and are obligated to pay CJI the sum of $565,517.84. CJI is informed

1  and believes and thereon alleges that defendants KESSLER and DOES 1-50, inclusive,

2  contend otherwise.

3      46.   It would be fair, just, and appropriate for this Court to determine the rights

4  and obligations of the parties as to this matter, and declaratory relief is necessary and

5  appropriate at this time so that CJI may ascertain its rights and duties and have ascertained

6  defendants' obligations.

7      47.   CJI therefore seeks a declaratory judgment providing that defendants

8  KESSLER and DOES 1-50, inclusive, are obligated to provide CJI with the sum of

9  $565,517.84 as a result of the inadvertent payment and the defendants' conduct as

10  described herein above.

11

12      WHEREFORE, CJI prays for judgment in its favor and against defendants

13  KESSLER and DOES 1-50, and each of them, as follows on the causes of action:

14  <u>ON THE FIRST CAUSE OF ACTION</u>

15      1.   For general and specific damages according to proof, including attorneys'

16  fees, costs, expenses, and interest thereon;

17  <u>ON THE SECOND CAUSE OF ACTION</u>

18      2.   For general and specific damages according to proof, including attorneys'

19  fees, costs, expenses, and interest thereon;

20  <u>ON THE THIRD CAUSE OF ACTION</u>

21      3.   For general and specific damages according to proof, including attorneys'

22  fees, costs, expenses, and interest thereon;

23  <u>ON THE FOURTH CAUSE OF ACTION</u>

24      4.   For general and specific damages according to proof, including attorneys'

25  fees, costs, expenses, and interest thereon;

26  <u>ON THE FIFTH CAUSE OF ACTION</u>

27      5.   For general and specific damages according to proof, including attorneys'

28  fees, costs, expenses, and interest thereon;

11

## ON THE SIXTH CAUSE OF ACTION

6.     For general and specific damages according to proof, including attorneys' fees, costs, expenses, and interest thereon;

## ON THE SEVENTH CAUSE OF ACTION

7.     For a judicial declaration that defendants KESSLER and DOES 1-50, inclusive, are obligated to provide CJI with the sum of $565,517.84 as a result of the inadvertent payment and the defendants' conduct as described herein above.

## ON ALL CAUSES OF ACTION

8.     For costs of suit incurred herein; and

9.     For such other and further relief, legal and/or equitable, as the Court may deem just and proper.

Dated:   May 15, 2008        ERNSTER LAW OFFICES, P.C.

By: _____
       Phil J. Montoya, Jr.
       Attorneys for Plaintiff
       Commission Junction, Inc.

**EXHIBIT "A"**

This Publisher Service Agreement ("Agreement") is made by and agreed to between Commission Junction, Inc., a Delaware corporation, located at 530 East Montecito Street, Santa Barbara, CA 93103, USA ("CJ"), and you ("You"). As an application service provider, CJ facilitates "Performance Marketing Programs" by providing services ("Network Service") via the Internet. A "Performance Marketing Program" ("Program") is where a person, entity, affiliate or its agent, operating "Web site(s)" (internet domain, or a portion of a domain) and/or other promotional methods to drive traffic to another's Web site or Web site content ("Publisher") may earn financial compensation ("Payouts") for "Transactions" (actions by Visitors as defined by the Advertiser) referred by such Publisher via an action made by a "Visitor" (any person or entity that is not the Publisher or the Publisher's agent) through an Internet connection ("Link") to a Web site or Web site content operated by another person or entity ("Advertiser") from an Advertiser authorized promotional method used by such Publisher. The Advertiser compensates the Publisher, in accordance with this Agreement and the Program Payout specifications.

### 1. Participation in Programs.

(a) Acceptance by Advertiser. During this Agreement You may apply to Advertiser Programs for the opportunity to earn Payouts by promoting Advertisers in accordance with the Advertiser's Program terms and complying with this Agreement. Upon approval by the Advertiser for acceptance into its Program, You may display (and remove) Links to Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms and this Agreement. An Advertiser's acceptance of You extends only to the entity, or individual, that enters into this Agreement with CJ.

(b) Program Terms. The details of an Advertiser's Program shall be available through the Network Service. Transactions qualifying for a Payout are defined by the Advertiser. Advertisers may change any Payout rate upon no less than 7 days written notice through the Network Service with effect from the 8th day (or such later date as specified by Advertiser).

(c) Additional Terms. Publishers and Advertisers may enter into direct contractual relationships through the apply to join process in the form of a click-through agreement hosted by CJ ("Click-through Agreement") or in the form of an offer made to You by Advertiser via the members' area on the Network Service ("Offer"). It is Your obligation to review and accept or decline a Click-through Agreement or Offer when such is presented to You. If accepted by You, compliance with the Click-through Agreement or Offer is solely Your responsibility. The terms and conditions of the Click-through Agreement or Offer may supersede or conflict with this Agreement and shall apply only with respect to Your relationship with that particular Advertiser.

(d) Prohibited Uses of Links.

(i) Locations. You may not place Links to an Advertiser's Web site or Web site content in third party newsgroups, message boards, blogs, unsolicited email and other types of spam, link farms, counters, chatrooms, or guestbooks. Publishers using IRC channels, instant messages or similar internet resources must designate their program as special requiring manual review and acceptance by the Advertiser.

(ii) Non-Bona Fide Transactions. You must promote Advertisers such that You do not mislead the Visitor, and such that the Links deliver bona fide Transactions by the Visitor to Advertiser from the Link. You shall not cause any Transactions to be made that are not in good faith, including, but not limited to, using any device, program, robot, iframes, or hidden frames. You may or may not be compensated for Transactions where You or Your agent are the Visitor. Multiple Leads from the same individual, entity or IP address may be considered non-bona fide Transactions. You shall not earn Payouts for non-bona fide Transactions.

(iii) Infringement. None of Your promotional activities may infringe an Advertiser's proprietary rights (including but not limited to trademark rights), CJ's proprietary rights, or a third party's proprietary rights.

(e) Updating Links. If Links to Advertiser are not dynamically updated through the Network Service, upon notification You are obligated to update an Advertiser's Links in order to earn Payouts.

### 2. Publisher Obligations to CJ.

(a) Accurate, Up-to-Date Information. You agree to provide CJ and Advertiser with accurate information about You and Your promotional methods, and to maintain up-to-date "Account" information (such as contact information, Web sites used, etc.). In Your Account, You must accurately, clearly and completely describe all promotional methods by selecting the appropriate descriptions and providing additional information when necessary. Some promotional methods will be designated by the system as "special". Special programs are linked to promotional methods and practices considered unique and require manual approval and acceptance by the Advertiser. CJ reserves the right to define any program as special.

(b) Use of Links. You represent and warrant that all promotional means used by You will not contain objectionable content (including but not limited to content that is misleading, libelous, defamatory, obscene, violent, bigoted, hate-oriented, illegal, and/or promoting illegal goods, services or activities), and that You will not mislead others. You agree to: (i) use ethical and legal business practices, (ii) comply with the Advertisers' Program terms and this Agreement, (iii) maintain a privacy policy on Your Web site and for any non-Web site based promotional method made available to Visitors, and (iv) designate Your Publisher Account as "special" if You promote an Advertiser(s) by any means other than displaying a Link to the Advertiser on Your Web site. CJ must approve all of Your promotional activities and may deem Your promotional activities inappropriate and a material breach of this Agreement in CJ's sole discretion. Our network quality department reviews publisher conduct and any suspected fraudulent, abusive or

otherwise illegal content or activity ~~~~ you through Your promotional methods, or ~~~~ perpetrated through use of the Network Service, is grounds for immediate termination of this Agreement or deactivation of Your Account.
(c) **Promotional Methods.** You represent and warrant that You will not engage in and/or facilitate spamming, indiscriminate advertising or unsolicited commercial email or otherwise fail to comply with the CAN SPAM Act of 2003 (Public Law 108-187 or any successor legislation), and/or any other laws and/or regulations that govern email marketing and/or communications. You represent and warrant that You will not engage in pop-up or pop-under advertising using any means involving third party properties and/or services (software). Pop up/unders are acceptable on a first party basis only when triggered by Your site content /site visit or by downloadable software applications for which You are the owner/operator. Pop up/unders delivered through downloadable software cannot engage in means that force clicks or perform redirects, or pop over a pay-per-click listing or natural search results. Pop up/unders must honor the CJ Publisher Code of Conduct requirements (as such requirements may be modified from time to time), including but not limited to: (i) installation requirements, (ii) enduser agreement requirements, (iii) afsrc=1 requirements; (iv) requirements prohibiting usurpation of a Transaction that might otherwise result in a Payout to another Publisher (e.g. by purposefully detecting and forcing a subsequent click-through on a link of the same Advertiser) and (v) non-interference with competing advertiser/ publisher referrals.
(d) **Personally Identifiable Information of Visitors.** You represent and warrant that You will not enable the Tracking Code to collect personally identifiable Information of Visitors that would allow CJ to personally identify Visitors.
(e) **Privacy.** You must conspicuously post Your privacy policy on Your Web site and otherwise make it available to all Visitors. Your privacy policy must comply with all laws and regulations regarding the privacy of Visitor information, be commercially reasonable, and fully and accurately disclose Your collection and use of Visitor information. You must fully and accurately disclose Your use of third party technology, including CJ's tracking technology, use of cookies and options for discontinuing use of such cookies.
(f) **Applicable Codes and Code Maintenance.** In order for CJ to record the tracking of Visitors' Transactions resulting from clicks on Links to Advertisers promoted by You, You must include and maintain a CJ "Tracking Code" within the Advertiser's Links. All Advertiser Links and all advertisements ("Ad Content") must be in a Network Service compatible format.
(g) **Usage and Security of Account.** You shall be responsible for all usage and activity on Your account and for loss, theft or unauthorized disclosure of Your password (other than through CJ's negligent or willful conduct or omission). You shall provide CJ with prompt written notification of any known or suspected unauthorized use of Your Account or breach of the security of Your Account.

## 3. CJ's Services.

(a) **Tracking Transactions and Payouts.** CJ shall determine (where possible) actual Payouts that should be credited to Your Account. CJ may, in CJ's sole discretion, apply an estimated amount of Payouts, if: (i) You are referring Visitors to Advertiser as verified by clicks through Links to Advertiser with CJ Tracking Code, (ii) where there is an error in Advertiser's transmission of Tracking Code data to CJ, and (iii) where CJ is able to utilize a historical analysis of Your promotion of Advertiser to determine an equitable amount of estimated Payouts.
(b) **Charge-backs.** An Advertiser may apply, or CJ may apply, a debit to Your Account in an amount equal to a Payout previously credited to Your Account in circumstances of : (i) product returns; (ii) duplicate entry or other clear error; (iii) non-bona fide Transactions; (iv) non-receipt of payment from, or refund of payment to, the Visitor by the Advertiser; or (v) Publisher failure to comply with Advertiser's Program terms or other agreement with Advertiser ("Charge-back"). Charge-backs may be applied to Your Account at any time, including previous payment cycles.
(c) **Access to Tracking and Reporting Tools.** CJ shall provide You with access to tracking and reporting tools, and to support services. From time to time CJ may offer optional services for a fee. Fees for such optional services are at CJ's then-current published rates or as may be quoted by CJ, and are payable in advance or may be off-set against Your positive Account balance (at CJ's discretion). Tracking detail regarding Visitor Transactions is not available on a real-time basis for all Advertisers and there may be reporting delays regarding Transactions for some Advertisers. CJ may make available, for fees that CJ shall publish from time-to-time, enhanced reporting capabilities and other services that are not included in the standard Network Service.
(d) **Support.** Support for your program is available on-line through the "Contact Us" area in the CJ Account Manager, which allows You to categorize and describe Your issue. Online help also allows You to check the status of all issues through the "Check Question Status" feature. Phone support may also be available during operating hours, except holidays.
(e) **Facilitating Payment of Payouts.** Subject to other provisions in this Agreement, CJ shall credit Your Account with a Payout for each qualifying Transaction in accordance with the Advertiser's Payout rate and Program terms for the relevant Transaction. On the 20th day of each calendar month, CJ will issue to You any positive balance in Your Account for Transactions reported for the previous month, provided Your Account balance exceeds the required "Minimum Account Balance." CJ shall have no obligation to make payment of any Payouts for which CJ has not received payment from the relevant Advertiser of all monies due to CJ (including for all Payouts owed by such Advertiser to all of such Advertiser's Publishers). If CJ elects, in its own discretion, not to make payment to You for amounts not received from an Advertiser, those amounts shall not be included in the Minimum Balance Amount. Your recourse for any earned Payouts not paid to You shall be to make a claim against the relevant Advertiser(s), and CJ disclaims any and all liability for such payment. You may elect to receive payment in any of the currencies that CJ supports (as may be amended by CJ). The conversion rate shall be determined in accordance with CJ's operating standards using the rates prevailing upon the date that payment is made to You, or upon the basis of historical

conversion rates if rates are unavailable. The number or amount of Transactions, credits for Payouts, and debits for Charge-backs, as calculated by CJ, shall be final and binding on You.

(f) **Dormant Accounts.** If Publisher's Account has not been credited with a valid, compensable Transaction that has not been Charged-back during any rolling, six consecutive calendar month period ("Dormant Account"), a dormant account fee at CJ's then-current rate shall be applied to Publisher's Account each calendar month that Publisher's Account remains an open yet Dormant Account or until Your Account balance reaches a zero balance, at which time the Account shall become deactivated. Transactions will not be counted if the Transaction subsequently becomes a Charge-back.

(g) **Negative Accounts.** You may have a negative balance if Your Account is debited amounts equivalent to previous Payouts for Charge-backs and You do not have an adequate Account balance to cover the Charge-back amounts. When You have a negative balance, You must immediately remit payment to CJ in an amount sufficient to bring Your Account to a zero balance, or Your Account is subject to 1.5% interest per month, compounded monthly.

### 4. Proprietary Rights.

(a) **Linking to Advertisers.** For each Advertiser's Program that You have been accepted to, the Advertiser is granting to You the right to display and Link to the Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms for the limited purposes of Promoting the Advertiser's Program, subject to the terms and conditions of this Agreement. Your use of the Link signifies Your agreement to refrain from copying or modifying any icons, buttons, banners, graphics files or content contained in the Link, including but not limited to refraining from removing or altering any copyright or trademark notices. As between CJ and Publisher, CJ owns all rights in and to all information regarding the Visitors that You refer to Advertisers through CJ.

(b) **CJ's Use of Your Marks.** You authorize CJ to utilize Your trademarks, service marks, tradenames, and/or copyrighted material that You provide to CJ through Your Account to promote Your participation in the Network Services.

(c) **Your Use of CJ's Proprietary Rights.** You agree that Your use of any CJ Web site (such as www.cj.com) and Your use of any CJ trademarks, service marks, tradenames, and/or URLs is subject to the license and terms of use that are available from such Web site ("Terms of Use"). You explicitly agree not to adopt or use in any manner any trademarks, service marks, tradenames, and/or URLs that are the same or confusingly similar to, or are combined with, those of CJ.

(d) **Retention of Rights.** All proprietary rights of Advertisers, You, and CJ, and all goodwill arising as a result of such rights, inure to the benefit of such owner.

(e) **No Challenge to CJ's/Advertiser's Proprietary Rights.** You acknowledge that You obtain no proprietary rights in CJ's trademarks, service marks, tradenames, URLs, copyrighted material, patents, and patent applications, and agree not to challenge CJ's proprietary rights. You acknowledge that You obtain no proprietary rights in Your Advertisers' proprietary rights, and agree not to challenge such Advertiser's proprietary rights.

### 5. Confidentiality.

(a) **Obligations.** You or CJ may provide the other with information that is confidential and proprietary to that party or a third party, as is designated by the disclosing party or that is reasonably understood to be proprietary and/or confidential ("Confidential Information"). The receiving party agrees to make commercially reasonable efforts, but in no case no less effort than it uses to protect its own Confidential Information, to maintain the confidentiality of and to protect any proprietary interests of the disclosing party. Confidential Information shall not include (even if designated by a party) information: (i) that is or becomes part of the public domain through no act or omission of the receiving party; (ii) that is lawfully received by the receiving party from a third party without restriction on use or disclosure and without breach of this Agreement or any other agreement without knowledge by the receiving party of any breach of fiduciary duty, or (iii) that the receiving party had in its possession prior to the date of this Agreement. Upon termination of this Agreement, You must destroy or return to CJ any Confidential Information provided by CJ to You under this Agreement.

(b) **Provision of Info to Advertisers/Third Parties.** You agree that CJ may, but is not obligated to, provide Your email address(es) and basic Publisher Account detail (including but not limited to Your address, phone and fax number, Web site name, the date the website or subscription email first entered into operation, and visitor demographics) to Advertisers. CJ may provide any and all Visitor, Transaction and/or Tracking Code data to the Advertiser to which You referred such Visitor, and to any third party in CJ's sole discretion, including but not limited to all regulatory, legislative and judicial bodies, and pursuant to allegations and claims of proprietary rights infringement. CJ reserves the right to be able to utilize Tracking Code data provided to it, which may include: information about Your performance statistics, to analyze Network Service trends, monitor Network Service efficiencies, maintain the integrity of the tracking code, promote Network Service capabilities and efficiencies, and promote You and Your Web performance to Advertisers.

### 6. Term, Termination, Deactivation and Notices.

(a) **Term.** This Agreement shall commence upon Your indication that You have accepted this Agreement by providing the required information and 'clicking through' the acceptance button on the CJ Web site and shall continue until terminated in accordance with the terms of this Agreement. This Agreement may be terminated by either party upon 15 days notice. This Agreement may be terminated immediately upon notice for Your breach of this Agreement. Your Account may be deactivated during investigation of breach of this Agreement. If this Agreement is

terminated based upon Your breach, and shall not be eligible to enter into a new or through Publisher Service Agreement with CJ, and any attempt to do so shall be null and void.

(b) **Termination by Advertiser.** An Advertiser may terminate You, one of Your Web sites, or Your ability to use a promotional method, from the Advertiser's Program for any or no reason, upon 7 days written notice with effect from the 8th day. Additionally, Advertiser may terminate You from the Advertiser's Program for breach of a third party's proprietary rights, and/or diluting, tarnishing or blurring an Advertiser's trademarks, tradenames, and/or service marks, or for Your material breach of the Advertiser's Program terms or of this Agreement.

(c) **Termination or Deactivation by CJ.** CJ may terminate You, one of Your Web sites, or Your use of a promotional method, from an Advertiser's Program, at any time in CJ's sole discretion. Breach of any Section of this Agreement is cause for immediate termination from an Advertiser's Program and/or termination of this Agreement, and may result in Chargeback of one or more Payouts. CJ may temporarily deactivate or terminate Your Account if: (i) You or Your agent are responsible for the improper functioning of Ad Content, or if You otherwise interfere with and/or fail to maintain the Tracking Code; (ii) Your Account has not been logged into and/or there have been no Transactions credited to Your Account for any 30 day period; (iii) You maintain a negative balance in Your Account; (iv) CJ determines You are diluting, tarnishing or blurring CJ's proprietary rights; (v) You begin proceedings to challenge CJ's proprietary rights; or (vi) a third party (including a CJ Advertiser) disputes Your right to use any Link, domain name, trademark, service mark, trade dress, or right to offer any service or good offered on Your Web site, or through any of Your promotional means. Upon termination of this Agreement, or in case of deactivation of Your Account, You shall no longer accrue Payouts in Your Account, including but not limited to subsequent sales and/or Leads for click-throughs that occurred prior to termination.

(d) **Termination of Programs and Offers.** Programs and Offers may be discontinued at any time.

(e) **Notices.** Except as provided elsewhere herein, both parties must send all notices relating to this Agreement to: (i) for CJ, via registered mail, return receipt requested or via an internationally recognized express mail carrier to Commission Junction, Inc., Attn: Legal Dept., 530 East Montecito Street, Santa Barbara, CA 93103 USA (effective upon actual receipt); and, (ii) for You, at the email or physical address listed on Your Account (effective upon sending as long as CJ does not receive an error message regarding delivery of the email) or five (5) days after mailing).

(f) **Post-termination.** Upon termination of this Agreement, any outstanding payments shall be paid by CJ to You within 90 days of the termination date, and any outstanding debit balance shall be paid by You to CJ within 30 days of termination of this Agreement. All payments are subject to recovery for Charge-backs. Upon termination of this Agreement, any permissions granted under this Agreement will terminate, and You must immediately remove all Links to Advertiser(s). Provisions of this Agreement that by their nature and context are intended to survive the termination of this Agreement shall survive the termination of this Agreement to the extent that and as long as is necessary to preserve a party's rights under this Agreement that accrued prior to termination.

### 7. Representations, Warranties, Disclaimers and Limitations.

(a) **Business Operations.** Each party will make reasonable commercial efforts to keep its Web site operational during normal business hours. However, the parties agree that it is normal to have a certain amount of system downtime and agree not to hold each other or Your Advertisers liable for any of the consequences of such interruptions. CJ may modify the Network Service, or discontinue providing the Network Service, or any portion thereof, at any time.

(b) **Authority.** Each party represents and warrants to the other party as to itself that the person executing this Agreement is authorized to do so on such party's behalf. IF YOU ARE AN INDIVIDUAL, YOU REPRESENT AND WARRANT THAT YOU WERE AT LEAST 18 YEARS OF AGE ON THE EFFECTIVE DATE OF THIS AGREEMENT.

(c) **Non-Infringement Warranties.** You represent and warrant that: (i) You have all appropriate authority to operate, and to any and all content on, Your Web site(s); (ii) You have all appropriate authority in any promotional method you may choose to use; (iii) Your Web site(s) and Your promotional methods do not and will not infringe a third party's, a CJ Advertiser's, or CJ's, proprietary rights; and (iv) You shall remain solely responsible for any and all Web sites owned and/or operated by You and all of Your promotional methods. CJ may or may not review all content on Your Web site or used by You in Your promotional methods.

(d) **Compliance with Laws.** You are responsible for compliance with the requirements of all relevant legislation (including subordinate legislation and the rules of statutorily recognized regulatory authorities) in force or applicable in the United States or in any other applicable territory, and warrant that no promotion method used by You or the content of Your Web site(s) will render CJ liable to any proceedings whatsoever.

(e) **Limitation of Liabilities.** ANY OBLIGATION OR LIABILITY OF CJ UNDER THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL OF YOUR PAYOUTS PAID TO YOU BY CJ UNDER THIS AGREEMENT DURING THE YEAR PRECEDING THE CLAIM. NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST THE OTHER PARTY TO THIS AGREEMENT MORE THAN ONE YEAR AFTER THE TERMINATION OF THIS AGREEMENT. YOU AGREE THAT CJ SHALL NOT BE LIABLE TO YOU, OR ANY THIRD PARTY (INCLUDING BUT NOT LIMITED TO A CLAIM BY ANOTHER PUBLISHER OR AN ADVERTISER OF THE NETWORK SERVICE), FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, LOST PROFITS, BUSINESS INTERRUPTION, LOSS OF PROGRAMS OR OTHER DATA, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR CLAIM.

(f) **Disclaimer of Warranties.** TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, CJ DISCLAIMS ALL WARRANTIES IMPLIED, INCLUDING, BUT NOT LIMITED TO, (A) MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS, (B) THAT THERE ARE

NO VIRUSES OR OTHER HARMFUL COMPONENTS, (C) THAT CJ'S SECURITY METHODS WILL BE
SUFFICIENT, (D) REGARDING CORRECTNESS, ACCURACY, OR RELIABILITY, OR (D) AGAINST
INTERFERENCE WITH ENJOYMENT OF THE PUBLISHER'S INFORMATION OR WEB SITE. ALL
'INFORMATION' AND 'COMPUTER PROGRAMS' PROVIDED TO YOU IN THE COURSE OF THIS AGREEMENT
ARE PROVIDED WITH ALL FAULTS, AND THE ENTIRE RISK AS TO SATISFACTORY QUALITY,
PERFORMANCE, ACCURACY, AND EFFORT IS WITH YOU. CJ IS, UNDER NO CIRCUMSTANCES,
RESPONSIBLE FOR THE PRACTICES, ACTS OR OMISSIONS OF ANY ADVERTISER OR PUBLISHER, OR
SUCH ADVERTISER OR PUBLISHER'S WEB SITE(S), AND/OR THE CONTENT OF AN ADVERTISER'S WEB
SITE OR THAT AN ADVERTISER MAKES AVAILABLE THROUGH THE NETWORK SERVICE.
(g) Remedies. No remedy or election shall be deemed exclusive but shall, wherever possible, be cumulative with all
other remedies at law or in equity.
(h) Benefit of the Bargain. THE PROVISIONS OF THIS SECTION 7 ARE AN ESSENTIAL ELEMENT OF THE
BENEFIT OF THE BARGAIN REFLECTED IN THIS AGREEMENT.

8. Publisher's Indemnification Obligations. Publisher shall defend, indemnify and hold CJ and Advertisers
harmless against all claims, suits, demands, damages, liabilities, losses, penalties, interest, settlements and
judgments, costs and expenses (including attorneys' fees) incurred, claimed or sustained by third parties, including
but not limited to Advertisers, directly or indirectly as a result of (a) Publisher's breach of or non-compliance with this
Agreement, (b) Publisher's violation of any law, or an alleged violation of law by CJ, that is a direct or indirect result of
Publisher's use of the Network Service, (c) Publisher's use of the Network Service, (d) Publisher's participation in any
Program, (c) any content, goods or services offered, sold or otherwise made available by Publisher to any person, (f)
Publisher's acts or omissions in using, displaying or distributing any internet links obtained from the Network Service
or elsewhere, including but not limited to Publisher's use of internet links via email distribution, (g) any claim that CJ is
obligated to pay tax obligations in connection with payment made to Publisher pursuant to this Agreement and/or any
Advertiser's Program, and (h) any violation or alleged violation by Publisher of any rights of another, including breach
of a person's or entity's intellectual property rights (each (a)-(h) individually is referred to hereinafter as a "Claim").
Should any Claim give rise to a duty of indemnification under this Section 8, CJ shall promptly notify Publisher, and
CJ shall be entitled, at its own expense, and upon reasonable notice to Publisher, to participate in the defense of
such Claim. Participation in the defense shall not waive or reduce any of Publisher's obligations to indemnify or hold
CJ harmless. Publisher shall not settle any Claim without CJs prior written consent. Publisher also shall indemnify
for any reasonable attorneys' fees or other costs incurred by an indemnified party in investigating or enforcing this
Section 8. In the context of this Section 8 only, the term "CJ" shall include officers, directors, employees, corporate
affiliates, subsidiaries, agents, and subcontractors.

9. Miscellaneous.
(a) Headings and References. Headings of Sections are for the convenience of reference only. Words indicated in
quotes and capitalized signify an abbreviation or defined form for indicated words or terms, including those definitions
contained in the opening paragraph
(b) Third Party Disputes. In the event of a third party claim against either: (a) CJ's intellectual property; or (b)
against CJ's right to offer any service or good on CJ's Web site(s) or if, in CJ's opinion, such a claim is likely, CJ shall
have the right, at its sole option and in its sole discretion, to (i) secure the right at CJ's expense to continue using the
intellectual property or good or service; or (ii) at CJ's expense replace or modify the same to make it non-infringing or
without misappropriation.
(c) Relationships of Parties/Third Party Rights. The relationships of the parties to this Agreement shall be solely
that of independent contractors, and nothing contained in this Agreement shall be construed otherwise. Nothing in
this Agreement or in the business or dealings between the parties shall be construed to make them joint venturers or
partners with each other. Neither party shall do anything to suggest to third parties that the relationship between the
parties is anything other than that of independent contractor. You agree that Your consent is not necessary to modify
any Advertiser Service Agreement.
(d) Choice of Law/Attorneys' Fees. This Agreement is governed by the laws of the State of California (USA),
except for its conflict of law provisions. The exclusive forum for any actions related to this Agreement shall be in the
state courts, and, to the extent that federal courts have exclusive jurisdiction, in Los Angeles, California. The parties
consent to such venue and jurisdiction and waive any right to a trial by jury. The application of the United Nations
Convention on the International Sale of Goods is expressly excluded. A party that primarily prevails in an action
brought under this Agreement is entitled to recover from the other party its reasonable attorneys fees and costs. CJ
controls and operates its Web site from its offices in the USA and access or use where illegal is prohibited.
(e) Force Majeure. Neither party shall be liable by reason of any failure or delay in the performance of its obligations
hereunder for any cause beyond the reasonable control of such party, including but not limited to electrical outages,
failure of Internet service providers, default due to Internet disruption (including without limitation denial of service
attacks), riots, insurrection, acts of terrorism, war (or similar), fires, flood, earthquakes, explosions, and other acts of
God.
(f) Severability/Waiver. If any provision of this Agreement is held by any court of competent jurisdiction to be illegal,
null or void or against public policy, the remaining provisions of this Agreement shall remain in full force and effect.
The parties shall in good faith attempt to modify any invalidated provision to carry out the stated intentions in this

Agreement. The waiver of any breach of any provision under this Agreement by any party shall not be deemed to be a waiver of any preceding or subsequent breach, nor shall any waiver constitute a continuing waiver.

(g) **Assignment and Acknowledgement.** Neither party may assign this Agreement without the prior express written permission of the other party. Notwithstanding the foregoing, Your consent shall not be required for assignment or transfer made by CJ (1) due to operation of law, or (2) to an entity that acquires substantially all of CJ's stock, assets or business, or (3) to a related entity (e.g. parent or subsidiary of parent). Your use of the Network Service is irrefutable acknowledgement by You that You have read, understood and agreed to each and every term and provision of this Agreement. CJ may establish from time to time rules and regulations regarding use of the Network Service as published on the Network Service and incorporated herein.

(h) **Marketing.** Publisher agrees that CJ may identify it as a CJ Publisher in client lists and may use Publisher's name and/or logo solely for such purpose in its marketing materials. Any other uses of Publisher's name and/or logo not otherwise described or contemplated herein shall require Publisher's prior written consent.

(i) **Entire Agreement, Assignment and Amendment.** This Agreement, including the Introduction, contains the entire understanding and agreement of the parties and there have been no promises, representations, agreements, warranties or undertakings by either of the parties, either oral or written, except as stated in this Agreement. This Agreement may only be altered, amended or modified by an instrument that is assented to by each party to this Agreement by verifiable means, including without limitation by written instrument signed by the parties or through a "click through" acknowledgement of assent. No interlineations to this Agreement shall be binding unless initialed by both parties. Notwithstanding the foregoing, CJ shall have the right to change, modify or amend ("Change") this Agreement, in whole or in part, by posting a revised Agreement at least 14 days prior to the effective date of such Change. Your continued use of the Network Service after the effective date of such Change shall be deemed Your acceptance of the revised Agreement.

COMMISSION JUNCTION, INC.
530 East Montecito Street
Santa Barbara, CA 93103 USA
a Delaware Corporation, EIN#41-41-1922033

"You": _____

Address: _____

_____

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

Federal ID # (or Company Reg. No.): _____

# EXHIBIT "B"

# Alyson Emmer

| | |
|---|---|
| **From:** | Peter Bexelius |
| **Sent:** | Wednesday, June 27, 2007 6:41 PM |
| **To:** | todd@dunningmarketing.com |
| **Subject:** | Kessler's Flying Circus - wiring instructions |

**Attachments:** Kesslers ltr_Final.doc

Hi Todd:

Further to our conversation, this is the letter I referred to. I appreciate your understanding in this matter. As we discussed, please wire us the funds ($565,517.84) less your wiring fee, tomorrow morning at your convenience. If you could kindly call me at (805-450-6126) and email to confirm once done, I'd greatly appreciate it.

Below are the payment instructions for wire payment:

<u>Wire Payment Information</u>
| | |
|---|---|
| Beneficiary: | Commission Junction |
| Bank: | Wells Fargo Bank |
| Address: | 420 Montgomery Street |
| | San Francisco, |
| | CA 94104 |
| Account No: | 4121196406 |
| Routing No: | 121 000 248 |
| Swift Code: | BIC WFBIUS6S |

Thanks again for your cooperation and understanding!

Cheers,

Peter Bexelius
Account Manager - Strategic Accounts

Commission Junction, a ValueClick Company
530 East Montecito Street
Santa Barbara, CA 93103
Direct: 805 730 8106
Fax: 805 730 8456
Email: pbexelius@cj.com

*Any disclosure, copying, distribution, posting or use of the contents of this information is prohibited and may be unlawful. This e-mail may contain proprietary or confidential information and is for the sole use of the intended recipient(s). Thank you.*

8/2/2007

June 27, 2007

Mr. Brian Dunning
Mr. Todd Dunning
Kessler's Flying Circus
15 High Blf.
Laguna Niguel, CA 92677

<u>Re: Kessler's Flying Circus—CID 1558264</u>

On June 20, 2007, following initial approval by your firm's advertiser, eBay Inc.,
Commission Junction issued a US Direct Deposit payment of $565,517.84 to your
checking account number as logged in our Commission Junction Marketplace ("CJM")
system. After this payment was processed by us, we were requested by eBay to suspend
payouts to various publishers, including your firm, pending a review of your potentially
questionable activity in CJM for the month of May.

Accordingly, we have attempted to recall the direct deposit transaction through the
banking system, but have been unsuccessful in completing the recall transaction due to
insufficient funds in your bank account described above.

We request your immediate cooperation by facilitating our recall of $565,517.84 from
your bank account to avoid the potential initiation of alternative actions to recall such
funds.

Remittance instructions:

By mail to:

Commission Junction
#774140
4140 Solutions Center
Chicago, IL 60677-4001

Or by wire to:

Routing number: 121000248
Account number: 4121196406

Please contact Peter Bexelius at (805) 730-8106 if you require additional information.

Sincerely,

Commission Junction, Inc.

## PROOF OF SERVICE

STATE OF CALIFORNIA      )
                          )  ss.
COUNTY OF LOS ANGELES     )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 70 South Lake Avenue, Suite 750, Pasadena, California 91101.

On May 16, 2008, I served the foregoing document described as **SECOND AMENDED SUMMONS AND COMPLAINT FOR DAMAGES** by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Stewart H. Foreman, Esq.
Freeland Cooper & Foreman LLP
150 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 541-0200
Facsimile: (415) 495-4332
*Attorney for Defendants, TODD DUNNING and KESSLER'S FLYING CIRCUS*

Scott Patrick Barlow, Esq.
General Counsel
30699 Russell Ranch Road, Suite 250
Westlake Village, California 91362
Telephone: (818) 575-4500
Facsimile: (818) 575-4501
*Co-counsel for Plaintiff COMMISSION JUNCTION INC.*

Ronald Rus, Esq.
Leo J. Presiado, Esq.
Rus, Miliban & Smith
2600 Michelson Drive
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
*Attorney for Defendant, BRIAN DUNNING and THUNDERWOOD HOLDINGS, INC.*

(X) **BY MAIL**      I caused such envelope(s) to be deposited in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Pasadena, California, 91101.

This document was produced on paper purchased as recycled.

(X)      STATE I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 16, 2008, at Pasadena, California.

Marta I. Rincon
_____
Marta I. Rincon

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 2600 Michelson Drive, Suite 700, Irvine, California 92612.

On November 6, 2008, I served the document(s) described as NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT BY JKESSLER'S FLYING CIRCUS; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE on the interested parties in this action.

[X] by placing   [ ] the original        [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

David R. Eberhart, Esq.                   Ronald Rus, Esq.
O'Melveny & Meyers LLP                    Rus, Miliband & Smith
Two Embarcadero Center, 28th Floor        2211 Michelson Drive, Ste 700
San Francisco, CA 94111                   Irvine, CA 92612

Stewart H. Foreman, Esq.
Freeland Cooper & Foreman, LLP
150 Spear Street, Ste 1800
San Francisco, CA 94105

[X]   BY MAIL

[X] As follows I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 6, 2008, at Irvine, CA.

PATRICK K. McClellan                      _____
Type or print name)                       (Signature)